**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>BAMBU GLOBAL LLC,<br><br>        Debtor | Chapter 7<br><br>Case No.: 22-40323-EDK<br><br>(Jointly Administered) |
| In re:<br><br>BAMBU VAULT LLC<br><br>        Debtor | Chapter 7<br><br>Case No.: 22-40324-EDK |

**TRUSTEE'S MOTION (I) FOR AUTHORITY TO SELL CERTAIN ESTATE ASSETS
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, FREE AND CLEAR
OF LIENS, CLAIMS, AND INTERESTS, (II) AUTHORIZE THE TRUSTEE TO ENTER
INTO AND PERFORM ITS OBLIGATIONS UNDER THAT CERTAIN ASSET
PURCHASE AGREEMENT, (III) REQUESTING A HEARING ON THE PROPOSED
SALE AND (IV) GRANTING RELATED RELIEF**

TO THE HONORABLE  ELIZABETH D. KATZ, CHIEF UNITED STATES BANKRUPTCY

JUDGE:

1.      NOW COMES Gary M. Weiner, Chapter 7 Trustee (the "Trustee") for Bambu

Global LLC and Bambu Vault LLC (collectively, the "Debtors") and hereby moves this Court

pursuant to Sections 363 of the Bankruptcy Code, Fed. R. Bankr. P. 6004, and MLBR 6004-1 for:

(a) authority to sell certain assets (the "Acquired Assets") of the Debtors' estate, including without

limitation: (i) all of the Debtors' intellectual property (the "Bambu Intellectual Property"); (ii) all

agreements pursuant to which the Debtors are granted a license, sublicense, covenant not to sue or

other right with respect to any third party intellectual property; (iii) 100% of the Debtors' equity

interest in INQUE Holdings, LLC, a Massachusetts limited liability company ("INQUE"); and (iv)

certain other assets, as set forth in Section 1.1 of that certain Asset Purchase Agreement dated

October 30, 2023 (the "APA")[1] between the Trustee and Bambu Purchaser SPV, LLC., a

corporation organized under the laws of the State of Delaware (the "Purchaser"), and (b) entry of

an order, substantially in the form of **Exhibit A** (i) setting a hearing (the "Preliminary Sale

Hearing") to consider approval of this motion (the "Sale Motion"), (ii) approving certain sales

procedures in connection with the proposed sale (the "Sale"), including setting an objection

deadline and (iii) approving a certain Expense Reimbursement in favor of the Purchaser (as defined

in the APA).

2.      The terms and conditions of the proposed Sale are memorialized in the APA, a copy

of which is attached as **Exhibit B**.  A proposed form of order approving the Sale is attached as

**Exhibit C** (the "Sale Order").  Under the APA, Purchaser has agreed to pay $200,000.00 for the

---

[1] Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the Asset Purchase
   Agreement.

2

Acquired Assets on the closing date of the Sale.  The APA also calls for the Sale of Acquired Assets free and clear of all liens, claims and interests, whether consensual or arising under applicable law, except as otherwise provided for by the APA or the Sale Order.  As described in greater detail below, the Trustee's decision to sell the Acquired Assets to the Purchaser is the result of a due diligence review of the Debtors' assets by the Trustee and his determination that the Sale will maximize the value of the Acquired Assets for the benefit of the Debtors' creditors.  The Trustee is seeking to complete the Sale by mid-December 2023.

## Jurisdiction and Venue

3.      The United States Bankruptcy Court for the District of Massachusetts, Central Division (the "Court") has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

4.      On April 29, 2022 (the "Petition Date"), the Debtors each filed voluntary petitions under Chapter 7 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") with this Court.

5.      On or about May 22, 2022, Janice G. Marsh was appointed as the Chapter 7 Trustee of the Debtors. On May 24, 2023, Janice Marsh resigned as Trustee and Gary M. Weiner was appointed as successor Trustee.

6.      During his ongoing due diligence review of the Debtors' assets and liabilities, the Trustee discovered that Bambu Vault LLC licensed certain of its intellectual property under an exclusive license agreement with INQUE LLC, dated February 15, 2019 (the "License Agreement").  The License Agreement granted INQUE the exclusive rights in North America to

3

commercialize the Bambu Intellectual Property in the area of skin tissue marking ink. The License

Agreement was not listed on Schedule G of the Debtors' Schedules of Assets (i.e. its Schedule of

Executory Contracts). The Bambu Intellectual Property was, however, generally described on its

Schedule A/B of its Schedule of Assets as having a value of $386,486.

7.    Notably, INQUE is a limited liability company controlled and owned, in part, by

the Debtors' Chairman Robb J. Osinski.

8.    After several requests by the Trustee, counsel to INQUE provided the Trustee with

a copy of the License Agreement in August 2023. A review of the License Agreement revealed

that INQUE was in default of, and had materially breached its obligations under the License

Agreement, including: (a) by failing to deliver certified Quarterly Reports, and (b) by repeatedly

failing to pay sublicense fees, including with respect to a sublicense agreement with MT.DERM

GmbH that the Trustee had become aware of (the "MT DERM Sublicense").

9.    On September 15, 2023, the Trustee served INQUE with a written termination

notice (the "Termination Notice"), thereby exercising his right to terminate the License Agreement

with INQUE. A copy of the Termination Notice is attached hereto as **Exhibit D**. To date, INQUE

has not responded to the Termination Notice, nor has INQUE attempted to cure its default under

the License Agreement. Pursuant to its terms, absent a cure to the Trustee's reasonable satisfaction,

the License Agreement will terminate on November 15, 2023.

10.    That same day, the Trustee filed with this Court a motion seeking authority to

conduct an examination of INQUE under Rule 2004 of the Federal Rules of Bankruptcy Procedure

(the "Rule 2004 Motion"). An endorsement order allowing the Trustee's Rule 2004 Motion was

entered on October 3, 2023.

11.     The Trustee has filed this Sale Motion seeking authority to sell the Acquired Assets, including the Bambu Intellectual Property free and clear of all liens, claims and interests including without limitation any claims or interests arising under or in connection with the License Agreement.

<u>**Summary of Proposed Sale**</u>

12.     The terms and conditions of the Sale are embodied in the APA and are summarized as follows:

**A)  <u>Assets Being Sold (APA Section 1.1)</u>**

Under the APA, the assets proposed to be sold by the Trustee consist primarily of intellectual property, the Debtors' equity interests in INQUE[2], and certain other property.

More specifically, the Acquired Assets include the following:

(a) all Bambu Intellectual Property, including (i) all rights to collect royalties and proceeds in connection therewith (but subject to certain limited exclusions set forth in Section 1.2(c) of the APA), (ii) all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other violations or conflicts respect thereto, and (iii) any and all corresponding rights that, now or hereafter, may be secured throughout the world with respect thereto;

(b) all rights under any agreements pursuant to which any Bambu Debtor is granted any license, sublicense, covenant not to sue, waiver, release, settlement, coexistence, permission to use or other right with respect to any third party Intellectual Property;

(c) 100% of the Bambu Debtors' membership interests in INQUE, and all rights as a member of INQUE Holdings, including under the Limited Liability Company Agreement of INQUE Holdings;

(e) except as set forth in Section 1.2, with respect to INQUE Holdings, LLC and the Acquired Assets, all demands, credits, statements, allowances, refunds, rebates, rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment;

---

[2] The Debtor Bambu Vault, LLC owns approximately 38.6% membership interest in INQUE.

(f) all Documents relating to the Acquired Assets, wherever located, including all historical licensing and approval documents and communications with licensees and sub-licensees; and

(g) all goodwill, payment intangibles and general intangible assets and rights of the Bambu Debtors arising from or relating to the Acquired Assets.

**B) Excluded Assets (APA Section 1.2)**

While the Sale will involve all of the Bambu Intellectual Property, certain assets will be excluded from the Sale.  Excluded Assets include all rights to collect royalties and other amounts owed, as of the Closing, to any Bambu Debtor under the License Agreement.

**C) Assumption or Payment of Certain Liabilities/Excluded Liabilities (APA Sections 1.3 and 1.4)**

Under the APA, Purchaser has agreed to assume certain limited liabilities relating to the Acquired Assets. Specifically, Purchaser has agreed to assume Liabilities (including all government charges or fees) arising solely out of the ownership or operation of the Acquired Assets by Purchaser from and after the Closing Date, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities").

Except for those Liabilities that it has expressly agreed to assume, the Purchaser shall not be responsible in any way for other Liabilities of the Debtors.

**D) Closing Consideration (APA Section 2.1)**

Purchaser has agreed to pay the Trustee in cash, at closing, the sum of $200,000.00 for the Acquired Assets.

**E) Contingencies to Closing (APA Section 7.1)**

The APA contains a number of conditions to closing that if not satisfied would permit either the Trustee or Purchaser to terminate the agreement.  There are several material conditions that, unless waived by Purchaser, must be satisfied before Purchaser can be required to close the Sale, including Bankruptcy Court approval of the proposed Sale and entry of the Sale Order, and the lack of any material breach of the Trustee's representations, warranties, and covenants set forth in the APA.

**F) Sale Free and Clear (APA Section 1.1)**

The Sale of the Acquired Assets will, pursuant to Section 363 of the Bankruptcy Code, be free and clear of all liens, claims and interests, including without limitation any lien,

claim or interest arising under or in connection with the License Agreement. Any and all such liens, claims, and interests shall attach with equal effect and priority to the proceeds of the sale.

**G) Expense Reimbursement (APA Section 8.3)**

The Trustee and Purchaser have agreed to an expense reimbursement arrangement whereby, in the event an Alternative Transaction is consummated, the Trustee shall pay to the Purchaser by wire transfer of immediately available funds (at closing of such transaction) an amount equal to the IP Expense Reimbursement Amount plus the General Expense Reimbursement Amount

(a) *IP Expense Reimbursement Amount* means an amount equal to the reasonable and documented out-of-pocket costs and expenses incurred by Purchaser and its Affiliates in connection with the preservation of the Bambu Intellectual Property (as set forth in Section 6.9 of the APA) which amount shall not exceed $35,000.

(b) *General Expense Reimbursement Amount* means an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of its counsel and any financial advisor) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, excluding, for the avoidance of doubt, the IP Expense Reimbursement Amount

## The Bankruptcy Process for Approval of the Proposed Sale

**A) Objections**

13.    If a party in interest, such as a creditor, does not believe that the proposed Sale is reasonable or in the best interest of the Debtor and its creditors, it can object to this Motion by filing a written objection setting forth the basis for the objection. The Trustee requests that the Court fix 4:00 p.m. (prevailing Eastern Time) on the date that is five (5) business days before the Preliminary Sale Hearing (the "Objection Deadline") as the date and time by which objections to the Sale Motion must be filed with the Court and copies served upon the following parties (the "Notice Parties") so as to be received by the Objection Deadline:

(a) Chapter 7 Trustee, Gary M. Weiner, 1441 Main Street, Suite 610, Springfield, MA, 01103, Email: Gweiner@weinerlegal.com

7

(b) Attorneys for the Purchaser, Proskauer Rose LLP, 1 International Pl, Boston, MA 02110 (Attn: Charles A. Dale; Email: Cdale@proskauer.com and Steven M. Peck; Email: SPeck@proskauer.com)

### B)  Offers to Acquire the Assets

14.     Likewise, any party interested in submitting a higher or otherwise better offer to purchase the Acquired Assets (or any portion thereof) (a "Counteroffer") should contact the undersigned Trustee at the earliest possible date.  The Trustee requests that the Court fix 4:00 p.m. (prevailing Eastern Time) on the date that is five (5) business days before the Preliminary Sale Hearing (the "Counteroffer Deadline") as the date and time by which any Counteroffers must be filed with the Court and copies served upon the Notice Parties so as to be received by the Objection Deadline.  Counteroffers must be (i) in writing and accompanied by a fully executed APA, together with a redlined version reflecting changes from the APA between the Trustee and Purchaser, (ii) propose cash consideration in an amount not less than the sum of the $200,000 ***plus*** the applicable Expense Reimbursement and IP Expense Reimbursement Amount.  In the event that a timely Counteroffer is filed with the Court and served on the Notice Parties, the Trustee will conduct an open cry auction between eligible parties (including the Purchaser) at the Preliminary Sale Hearing.

### C)  Preliminary Sale Hearing

15.     The Trustee requests that the Court enter an order, substantially in the form of **Exhibit A**: (a) scheduling a Preliminary Sale Hearing to consider approval of the Sale Motion for the week of November 13, 2023, or such proximate date as the Court's calendar permits; (b) approving the proposed Objection Deadline and Counteroffer Deadline; and (c) approving the proposed Expense Reimbursement (as defined in the APA).

### D)  Sale Order

8

16.     The Trustee intends that Court approval of the Sale will be effected through entry of a sale order (i) approving the APA, (ii) authorizing the Trustee's Sale of the Acquired Assets free and clear of liens, claims, and interests (other than the permitted liens set forth in the APA), (iii) authorizing the Trustee's assumption and assignment of the Acquired Assets pursuant to Section 365 of the Bankruptcy Code, and (iv) containing such additional provisions and protections of the estate and Purchaser as are typical for an asset sale pursuant to Sections 363 and 365 of the Bankruptcy Code. A proposed form of sale order is attached hereto as **Exhibit C**.

## CONCLUSION

**WHEREFORE** the Trustee respectfully requests the Court: (a) enter the proposed order, substantially the form attached as **Exhibit A**, (i) setting a Preliminary Sale Hearing to consider approval of the Sale Motion, (ii) approving certain sales procedures in connection with the proposed Sale, including setting an objection deadline and (iii) approving a certain Expense Reimbursement (as defined in the APA).

Dated: November 1, 2023
     Springfield, MA

Respectfully submitted,

GARY M. WEINER, ESQ.
Chapter 7 Trustee of Bankruptcy Estates of
Bambu Global, LLC and Bambu Vault LLC
by his counsel

*/s/ Gary M. Weiner, Esq.*

Gary M. Weiner, Esq., BBO# 548341
Robert E. Girvan III, Esq. BBO# 569063
1441 Main Street, Suite 610
Springfield, MA, 01103
Tel No. (413) 732-6840
Email: Gweiner@weinerlegal.com

9

**<u>Exhibit A</u>**

Proposed Interim Order

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>BAMBU GLOBAL LLC,<br><br>     Debtor | Chapter 7<br><br>Case No.: 22-40323-EDK<br><br>(Jointly Administered) |
| In re:<br><br>BAMBU VAULT LLC<br><br>     Debtor | Chapter 7<br><br>Case No.: 22-40324-EDK<br><br>**Re: ECF No. [____]** |

**[PROPOSED] ORDER (I) SETTING AN INTERIM HEARING ON THE PROPOSED
SALE, (II) SETTING THE OBJECTION DEADLINE FOR THE PROPOSED SALE, (III)
APROVING THE TRUSTEE'S PROPOSED EXPENSE REIMBURSMENT AND (IV)
GRANTING RELATED RELIEF**

Upon consideration of the *Trustee's Motion (I) For Authority to Sell Certain Estate Assets*
*Pursuant to Section 363 of the Bankruptcy Code, Free and Clear of Liens, Claims and Interests,*
*(II) Authorize the Trustee to Enter Into and Perform Its Obligations Under That Certain Asset*
*Purchase Agreement, (III) Requesting a Hearing on the Proposed Sale, and (IV) Granting Related*
*Relief* (the "Sale Motion")[3] pursuant to which Gary M. Weiner, Chapter 7 Trustee (the "Trustee")
for Bambu Global LLC and Bambu Vault LLC (collectively, the "Debtors") seeks entry of an order
of this Court; (a)   setting an objection deadline (the "Objection Deadline") to the Trustee's
proposed sale (the "Sale") of certain assets (the "Acquired Assets") of the Debtors' estate,
including without limitation: (i) all of the Debtors' intellectual property (the "Bambu Intellectual

---

[3] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Sale Motion or the
APA (as applicable)

Property"); (ii) all agreements pursuant to which the Debtors are granted a license, sublicense, covenant not to sue or other right with respect to any third party intellectual property; (iii) 100% of the Debtors' equity interest in INQUE Holdings, LLC, a Massachusetts limited liability company ("INQUE"); and (iv) certain other assets, as set forth in Section 1.1 of that certain Asset Purchase Agreement dated October 30, 2023 (the "APA")[4] between the Trustee and Bambu Purchaser SPV, LLC, a corporation organized under the laws of the State of Delaware (the "Purchaser"), to Purchaser (or its permitted designee); (b) approving the proposed Expense Reimbursement in favor of the Purchaser (as defined in the APA) and (c) scheduling a hearing on the Sale, and the Court having found and determined that the relief sought in the Sale Motion is in the best interests of the Debtors estate and the creditors thereof, and all parties in interest,

**IT IS HEREBY ORDERED THAT:**

1.      On November ___, 2023 at __:__ _.m. (prevailing Eastern time), a hearing (the "Preliminary Sale Hearing") will be held before the undersigned Judge of the United States Bankruptcy Court to consider approval of the Trustee's Sale Motion to (i) sell the Acquired Assets pursuant to Section 365 of the Bankruptcy Code, and (ii) seek entry of the proposed Sale Order authorizing the sale of the Acquired Assets to the Purchaser.

2.      The deadline for the filing of objections to entry of the Sale Order is no later than 4:00 p.m. (prevailing Eastern Time) on the date that is the five (5) days prior to the Preliminary Sale Hearing Date (the "Objection Deadline").  Any objections to the Sale Motion must be filed with the Court and copies served upon the following parties (the "Notice Parties") so as to be received by the Objection Deadline:

---

[4] Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the Asset Purchase Agreement and the Sale Motion, as applicable.

(a) Chapter 7 Trustee, Gary M. Weiner, 1441 Main Street, Suite 610, Springfield, MA, 01103, Email: GWeiner@weinerlegal.com

(b) Attorneys for the Purchaser, Proskauer Rose LLP, 1 International Pl, Boston, MA 02110 (Attn: Charles A. Dale; Email: CDale@proskauer.com and Steven M. Peck; Email: SPeck@proskauer.com)

3.      The deadline for submitting a higher or otherwise better offer to the purchase of the Acquired Assets (or any purchase thereof) (a "Counteroffer") is 4:00 p.m. (prevailing Eastern Time) on the date that is five (5) business days prior to the Preliminary Sale Hearing (the "Counteroffer Deadline").  Any Counteroffers must be filed with the Court and copies served upon the Notice Parties so as to be received by the Objection Deadline.  Counteroffers must be (i) in writing and accompanied by a fully executed Asset Purchase Agreement, together with a redlined version reflecting changes from the APA between the Trustee and Purchaser, (ii) propose cash consideration in an amount of not less than the sum of the $200,000 plus the applicable Expense Reimbursement and IP Expense Reimbursement Amount.  In the event that a timely Counteroffer is filed with the Court and served on the Notice Parties, the Trustee will conduct an open cry auction between eligible parties (including the Purchaser) at the Preliminary Sale Hearing.

4.      In the event that an Alternative Transaction is consummated, the Trustee shall pay to Purchaser an amount equal to the IP Expense Reimbursement Amount plus the General Expense Reimbursement Amount.

(i)      *IP Expense Reimbursement Amount* means an amount equal to the reasonable and documented out-of-pocket costs and expenses incurred by Purchaser and its Affiliates in connection with the preservation of the Bambu Intellectual Property (as set forth in Section 6.9 of the APA) which amount shall not exceed $35,000.

(ii)      *General Expense Reimbursement Amount* means an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and

expenses of its counsel and any financial advisor) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of the APA, excluding, for the avoidance of doubt, the IP Expense Reimbursement Amount.

5.     The Court shall retain exclusive jurisdiction with respect to the terms and provisions of the Sale Motion and the APA.


Dated:_____                 _____

                                               Honorable Elizabeth D. Katz
                                               Chief United States Bankruptcy Judge

**<u>Exhibit B</u>**

Asset Purchase Agreement

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**DATED AS OF OCTOBER 30, 2023**

**BY AND AMONG**

**BAMBU PURCHASER SPV, LLC, AS PURCHASER,**

**AND**

**GARY M. WEINER, IN HIS CAPACITY AS CHAPTER 7 TRUSTEE-IN-BANKRUPTCY FOR BAMBU GLOBAL LLC AND BAMBU VAULT LLC, AS SELLER**

# TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES**....................................................................**2**
1.1     Purchase and Sale of the Acquired Assets ...........................................2
1.2     Excluded Assets ...................................................................................3
1.3     Assumption of Certain Liabilities ........................................................5
1.4     Excluded Liabilities .............................................................................5
1.5     [Reserved] ............................................................................................6

**ARTICLE II CONSIDERATION; CLOSING** ....................................................**6**
2.1     Consideration .......................................................................................6
2.2     Closing .................................................................................................6
2.3     Closing Deliveries by Seller ................................................................6
2.4     Closing Deliveries by Purchaser ..........................................................7
2.5     Withholding .........................................................................................7

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** ...........**7**
3.1     Organization and Qualification ............................................................7
3.2     Authorization of Agreement .................................................................7
3.3     Conflicts; Consents .............................................................................8
3.4     Title .....................................................................................................8
3.5     No Litigation ........................................................................................8
3.6     Brokers .................................................................................................8
3.7     No Other Representations or Warranties ..............................................8

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** .....**9**
4.1     Organization and Qualification ............................................................9
4.2     Authorization of Agreement .................................................................9
4.3     Conflicts; Consents .............................................................................9
4.4     Brokers .................................................................................................9
4.5     No Litigation ........................................................................................9
4.6     No Additional Representations or Warranties ......................................9
4.7     No Outside Reliance ............................................................................9

**ARTICLE V BANKRUPTCY COURT MATTERS** ..........................................**10**
5.1     Bankruptcy Actions ...........................................................................10
5.2     [Reserved] ..........................................................................................10
5.3     Sale Order ..........................................................................................11
5.4     Approval .............................................................................................11

**ARTICLE VI COVENANTS AND AGREEMENTS** ..........................................**11**
6.1     Conduct of Business; Preservation of Acquired Assets......................11
6.2     Access to Information .........................................................................12
6.3     Regulatory Approvals .........................................................................13
6.4     Reasonable Efforts; Cooperation .......................................................14
6.5     Further Assurances .............................................................................14
6.6     Insurance Matters...............................................................................14

i

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 6.7 | Receipt of Misdirected Assets; Liabilities | 14 |
| 6.8 | Use of Name | 15 |
| 6.9 | Power of Attorney Maintenance of Intellectual Property | 15 |

**ARTICLE VII CONDITIONS TO CLOSING** ... **15**

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 15 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 15 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 16 |
| 7.4 | Waiver of Conditions | 17 |

**ARTICLE VIII TERMINATION** ... **17**

| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 17 |
| 8.2 | Effect of Termination | 18 |
| 8.3 | Expense Reimbursement Upon Sale to Third Party. | 18 |

**ARTICLE IX TAXES** ... **19**

| | | |
|---|---|---|
| 9.1 | Transfer Taxes | 19 |
| 9.2 | Allocation of Purchase Price | 19 |
| 9.3 | Cooperation | 19 |

**ARTICLE X MISCELLANEOUS** ... **19**

| | | |
|---|---|---|
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 19 |
| 10.2 | Expenses | 20 |
| 10.3 | Notices | 20 |
| 10.4 | Binding Effect; Assignment | 21 |
| 10.5 | Amendment and Waiver | 21 |
| 10.6 | Third Party Beneficiaries | 21 |
| 10.7 | Non-Recourse | 21 |
| 10.8 | Severability | 22 |
| 10.9 | Construction | 22 |
| 10.10 | Complete Agreement | 22 |
| 10.11 | Specific Performance | 22 |
| 10.12 | Jurisdiction and Exclusive Venue | 23 |
| 10.13 | Governing Law; Waiver of Jury Trial | 23 |
| 10.14 | Counterparts and PDF | 24 |
| 10.15 | Bulk Sales Laws | 24 |
| 10.16 | Seller's Representative | 24 |

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** ... **25**

| | | |
|---|---|---|
| 11.1 | Certain Definitions | 25 |
| 11.2 | Rules of Interpretation | 31 |

140825317v9

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| **Schedule I** | Bambu Intellectual Property |
| | |
| **Exhibit A** | Power of Attorney |
| **Exhibit B** | Sale Order |

140825317v9

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*"), dated as of October 30, 2023, is made by and between Bambu Purchaser SPV, LLC, a Delaware limited liability company ("*Purchaser*"), and Gary M. Weiner, in his capacity as Chapter 7 trustee-in-bankruptcy ("*Seller*") for Bambu Global LLC, a Delaware limited liability company, and Bambu Vault LLC, a Delaware limited liability company (collectively, the "*Bambu Debtors*"). Purchaser and Seller are referred to herein individually as a "*Party*" and collectively as the "*Parties*."

WHEREAS, on April 29, 2022 (the "*Petition Date*"), the Bambu Debtors  commenced voluntary cases under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the District of Massachusetts Central Division (the "*Bankruptcy Court*"), which cases are jointly administered for procedural purposes under Case No. 22-40323-EDK (Bankr. D.M.A.) (collectively, the "*Bankruptcy Cases*");

WHEREAS, Gary M. Weiner has been duly appointed to serve as the Chapter 7 Trustee for each of the Bambu Debtors; and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to Section 363 of the Bankruptcy Code, upon the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Purchaser or its designee, and Purchaser or one or more of its designees shall purchase, acquire and accept from Seller, all of the Bambu Debtors' bankruptcy estates' collective right, title and interest in and to the Acquired Assets, free and clear of all Liabilities (other than Assumed Liabilities) and Encumbrances. "*Acquired Assets*" means the following assets of each Bambu Debtor, but excluding in all cases the Excluded Assets:

(a)    all Bambu Intellectual Property, including (i) all rights to collect royalties and proceeds in connection therewith (except as set forth in Section 1.2(c) below), (ii) all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other

violations or conflicts respect thereto, and (iii) any and all corresponding rights that, now or hereafter, may be secured throughout the world with respect thereto;

(b)     all rights under any agreements pursuant to which any Bambu Debtor is granted any license, sublicense, covenant not to sue, waiver, release, settlement, coexistence, permission to use or other right with respect to any third party Intellectual Property;

(c)     100% of the Bambu Debtors' equity interests in INQUE Holdings, LLC, a Massachusetts limited liability company (such equity interests, the "**_INQUE Interests_**"), and all rights as a member of INQUE Holdings, LLC, including under the Limited Liability Company Agreement of INQUE Holdings, LLC;

(d)     [Reserved];

(e)     except as set forth in Section 1.2(c) below, with respect to INQUE Holdings, LLC and the Acquired Assets, all demands, credits, statements, allowances, refunds, rebates, rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment;

(f)     all Documents relating to the Acquired Assets, wherever located, including all historical licensing and approval documents and communications with licensees and sub-licensees; and

(g)     all goodwill, payment intangibles and general intangible assets and rights of the Bambu Debtors arising from or relating to the Acquired Assets.

At any time prior to Closing, Purchaser may, in its sole discretion, upon written notice to Seller, revise this Section 1.1 to exclude any asset from the definition Acquired Assets, which exclusion shall have no effect on the Purchase Price.

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver any assets of the Bambu Debtors other than the Acquired Assets, including the following assets and properties of the Bambu Debtors (collectively, the "**_Excluded Assets_**"):

(a)     all cash, all bank accounts, and all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller to the extent not an Acquired Asset, and any retainers or similar amounts paid to Advisors or other professional service providers;

(b)     all Contracts of Seller;

(c)     all rights, as of the Closing Date, to collect royalties and other amounts owed to any Bambu Debtor under the Exclusive License Agreement, dated February 15, 2019, between Bambu Vault, LLC and INQUE Holdings, LLC (together with any modification or amendment, the "**_License Agreement_**"). For avoidance of doubt, except as specifically set forth

3

in the preceding sentence, in accordance with Section 1.1(e) above, all demands, credits, claims, counterclaims, defenses and rights against INQUE Holdings, LLC shall be Acquired Assets;

(d)        all Documents (including information stored on the computer systems, data networks or servers of Bambu Debtors) (i) to the extent they relate solely to any of the Excluded Assets or Excluded Liabilities, (ii) that are a Bambu Debtor's financial accounting Documents, minute books, organizational documents, stock certificates, stock registers and such other books and records of such Bambu Debtor as pertaining to ownership, organization or existence of such Bambu Debtor, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks (except, for the avoidance of doubt, those relating to INQUE Holdings, LLC), or (iii) that Seller or a Bambu Debtor is required by Law to retain;

(e)        all documents prepared or received by Seller, the Bambu Debtors or any of their Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the transactions contemplated hereby or thereby, or the Bankruptcy Case, including (i) all records and reports prepared or received by Seller, the Bambu Debtors or any of their Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of the Bambu Debtors' businesses or assets, and (iii) confidentiality agreements with prospective purchasers of any assets or liabilities of the Bambu Debtors that are not Acquired Assets or the Assumed Liabilities or any portion thereof, and (iv) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities or the Bankruptcy Case;

(f)        all current and prior insurance policies of the Bambu Debtors, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, that are not Acquired Assets;

(g)        other than the INQUE Interests, all stock, membership interests or other equity interests of Seller or any of its Subsidiaries or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests, in all cases;

(h)        (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date and that is not an Acquired Asset, and (iii) all claims that Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(i)        Seller's claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between Seller and Purchaser entered into on or after the date hereof;

140825317v9

(j)     all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, other than those arising from or relating to the Acquired Assets;

(k)     all Liabilities or other amounts owing from any Bambu Debtor or any of its Subsidiaries that do not relate to the Acquired Assets; and

(l)     all Bambu Plans and trusts, as well as insurance policies, rights and other assets set aside and specifically reserved solely to fund benefits payable under such Bambu Plans.

1.3     <u>Assumption of Certain Liabilities</u>. Upon the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with its terms), and Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, all Liabilities (including all government charges or fees) arising solely out of the ownership or operation of the Acquired Assets by Purchaser from and after the Closing Date, without duplication and only to the extent not paid prior to the Closing (collectively, the "***Assumed Liabilities***").  For the avoidance of doubt, Assumed Liabilities shall not include any Liabilities in respect of Excluded Assets or Excluded Liabilities.

1.4     <u>Excluded Liabilities</u>. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities (including in respect of Excluded Taxes) of, or Action against, Seller or the Bambu Debtors of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, including:

(a)     all Liabilities, including all accounts payable, trade payables, and Excluded Taxes as of the Closing Date;

(b)     the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with the Bambu Plans and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in 26 C.F.R. §54.4980B-9;

(c)     any Liabilities or obligations of any Bambu Debtor, its estate, or any ERISA Affiliate under any Bambu Plan;

(d)     any Liabilities and obligations that are not Assumed Liabilities relating to any current or former directors, officers, managers, employees, consultants or other service providers of the Bambu Debtors or any ERISA Affiliate (or any spouse, dependent or beneficiary thereof), with respect to their employment, engagement or termination of employment or

5

engagement with the Bambu Debtors or any ERISA Affiliate, including any obligation of the Bambu Debtors or any ERISA Affiliate to provide continuation coverage to any current or former employee the Bambu Debtors or any ERISA Affiliate (or any spouse, dependent or beneficiary thereof) under COBRA regardless of when such obligation may arise; and

      (e)    all Liabilities arising under section 503(b) of the Bankruptcy Code.

All Liabilities referred to above shall be referred to collectively as the "***Excluded Liabilities***".

      1.5    [Reserved].

# ARTICLE II
## CONSIDERATION; CLOSING

      2.1    <u>Consideration</u>. The aggregate consideration to be paid by Purchaser for the purchase of the Acquired Assets shall be a purchase price of $200,000 (the "***Purchase Price***").

      2.2    <u>Closing</u>. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "***Closing***") will take place by telephone conference and electronic exchange of documents (<u>provided</u>, <u>however</u>, that any documents required to be delivered in original, physical form under this Agreement shall be delivered in such form at the Closing) at 9:00 a.m. Eastern Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in <u>Article VII</u> (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time as the Parties may agree in writing; <u>provided</u>, <u>however</u>, that in no event shall the closing occur prior to November 17, 2023. The date on which the Closing actually occurs is referred to herein as the "***Closing Date***." <u>Notwithstanding anything contained herein to the contrary</u>, Purchaser, in its sole and absolute discretion, may cause all, or any portion, of the Acquired Assets (the "***Retained Acquired Assets***") to remain in possession of Seller following the Closing for the benefit of Purchaser. If any Retained Acquired Assets remain in Seller's possession for any reason following the Closing, such Retained Acquired Assets shall not be disposed of without the express written consent of Purchaser, and Seller shall promptly deliver such Retained Acquired Assets to Purchaser upon written notice from Purchaser.

      2.3    <u>Closing Deliveries by Seller</u>. At or prior to the Closing, Seller shall deliver to Purchaser (or one or more of its designees, as applicable):

      (a)    a bill of sale and assignment and assumption agreement, each in a form to be agreed upon by Purchaser and Seller prior to the Closing (the "***Bill of Sale***"), duly executed by Seller on behalf of each Bambu Debtor;

      (b)    an original, physical copy of a short-form intellectual property assignment agreement in a form to be agreed upon by Purchaser and Seller prior to the Closing (the "***IP Assignment***"), duly executed in ink by Seller on behalf of each Bambu Debtor;

(c)    electronic copies of all Bambu Intellectual Property and all physical embodiments thereof within Sellers' possession or control, and control over all Domain Names, all domain name registrar and hosting accounts associated with such Domain Names, and all Social Media Accounts;

(d)    an IRS Form W-9 duly executed by Seller; and

(e)    a certificate, dated as of the Closing Date, executed by Seller certifying that the conditions set forth in Sections 7.2(a) through 7.2(f) have been satisfied.

2.4    <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to Seller:

(a)    the Bill of Sale, duly executed by Purchaser; and

(b)    the IP Assignment, duly executed by Purchaser.

2.5    <u>Withholding</u>. Purchaser shall not be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, except as required by applicable Law. To the extent that amounts are deducted or withheld and paid to the appropriate Governmental Body, such deducted or withheld amounts shall be treated for all purposes of this Agreement as having been delivered and paid to Seller or any other recipient of payment in respect of which such deduction and withholding was made.

# ARTICLE III
# REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows:

3.1    <u>Organization and Qualification</u>. As of the Petition Date, each of the Bambu Debtors was a limited liability company duly organized and validly existing under the laws of the State of Delaware.

3.2    <u>Authorization of Agreement</u>. Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the other Transaction Agreements to which Seller is a party, and the consummation by Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of Seller, as applicable, and no other organizational proceedings on Seller's part are necessary to authorize the execution, delivery and performance by Seller of this Agreement or the other Transaction Agreements and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which Seller is a party have been, or will be, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors ' rights generally and (b) is subject to general principles of equity,

7

whether considered in a proceeding at law or in equity (collectively, the "***Enforceability Exceptions***").

3.3    <u>Conflicts; Consents</u>. To the Seller's knowledge, assuming that requisite Bankruptcy Court approvals are obtained, neither the execution and delivery by Seller of this Agreement or the other Transaction Agreements, nor the consummation by Seller of the transactions contemplated hereby or thereby, nor performance or compliance by Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, or (iii) result in the creation of any Encumbrance on any Acquired Asset, except, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    <u>Title</u>. Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or a valid leasehold interest in, all of the Acquired Assets, free and clear of all Encumbrances. Seller will transfer to Purchaser title to, or where expressly provided for herein a valid contractual interest in, all of the Acquired Assets free and clear of all Encumbrances.

3.5    <u>No Litigation</u>. There are no Actions pending or, to Seller's knowledge, threatened against or affecting Seller that seek to restrain, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that will adversely affect Seller's performance of its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement or would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

3.6    <u>Brokers</u>. No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Seller.

3.7    <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> (in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "***Express Representations***") (it being understood that Purchaser and the Purchaser Group have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Seller nor any other Person on behalf of Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets, or the Assumed Liabilities. Nothing contained in this <u>Section 3.7</u> shall impact a party's rights or obligations in respect of fraud.

8

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows.

4.1    <u>Organization and Qualification</u>. Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.

4.2    <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the transactions contemplated hereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the transactions contemplated hereby. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3    <u>Conflicts; Consents</u>. Assuming that requisite Bankruptcy Court approvals are obtained, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the transactions contemplated hereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (a) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, or (b) violate any Law or Order applicable to Purchaser, except, in the case of <u>clauses (a)</u> or <u>(b)</u>, as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

4.4    <u>Brokers</u>. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.5    <u>No Litigation</u>. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser except as would not, individually or in the aggregate, reasonably be expected to have  a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

4.6    <u>No Additional Representations or Warranties</u>. Except for the representations and warranties contained in this <u>Article IV</u>, Seller acknowledges that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Seller by Purchaser.

4.7    <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article IV</u> or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own

9

behalf and on behalf of the Purchaser Group, that the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the transactions contemplated by this Agreement. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group.  Nothing contained in this <u>Section 4.7</u> shall impact a party's rights or obligations in respect of fraud.

### ARTICLE V
### BANKRUPTCY COURT MATTERS

5.1     <u>Bankruptcy Actions</u>.

(a)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Seller shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(b)     The Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order. Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(c)     Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the transactions contemplated by this Agreement.

(d)     Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Seller must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about the Bambu Debtors to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

5.2     [Reserved].

5.3   <u>Sale Order</u>. The Sale Order shall be in a form and substance acceptable to Purchaser and shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than  Assumed Liabilities), and (iii) the performance by Seller of his obligations under this Agreement, (b) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Bambu Debtor, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (c) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of  Seller or any Bambu Debtor arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, and (d) find that Purchaser shall have no Liability for any Excluded Liability. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

5.4   <u>Approval</u>. Seller's obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of the Sale Order. Nothing in this Agreement shall require Seller to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court.

**ARTICLE VI**
**COVENANTS AND AGREEMENTS**

6.1   <u>Conduct of Business; Preservation of Acquired Assets</u>.

(a)   Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, as the case may be, (iii) as expressly required or permitted by this Agreement, or (iv) to the extent related solely to an Excluded Asset or an Excluded Liability, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), Seller shall use commercially reasonable efforts to maintain and preserve the Acquired Assets in their present condition in all material respects and pay all applicable Taxes as such Taxes become due and payable.

(b)   Without limiting the foregoing, during the period from the date of this Agreement until the Closing, Seller shall take best efforts to pursue, prosecute, maintain, protect and enforce all of the Bambu Intellectual Property (including all patents and pending patent applications), and to cause each lapsed patent and patent application included in the Bambu Intellectual Property to be reinstated prior to its next applicable deadline.

(c)   Without limiting the generality of Section 6.1(a), except (i) as required by applicable Law, Order or a Governmental Body, (ii)  as expressly required or permitted by this

11

Agreement, or (iii) to the extent related to an Excluded Asset or an Excluded Liability, unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall not, for or on behalf of any Bambu Debtor:

      (i)    sell, lease, transfer or otherwise dispose of, or mortgage or pledge any Acquired Asset, grant or allow any Encumbrance on any Acquired Asset;

      (ii)    enter into any agreement that impairs, limits or restricts the use or value of the Acquired Assets;

      (iii)    settle any pending or threatened Action against Seller that would result in an Assumed Liability;

      (iv)    cancel or compromise any material claim, cause of action, right of recovery and right of set-off or waive or release any material right, in each case, that is related to an Acquired Asset;

      (v)    make, revoke or change any Tax election, file any amended Tax Return, revoke or change any Tax accounting method, enter into any closing agreement within the meaning of Section 7121 of the Code, request any Tax ruling with or from a Governmental Body, surrender any right to claim a Tax refund, offset or other reduction in Tax liability, consent to any extension or waiver of limitations period applicable to any Tax claim or assessment, or settle any Tax proceeding, in each case, with respect to the Acquired Assets;

      (vi)    (A) sell, assign, transfer, dispose of, abandon, allow to lapse, license, sublicense or grant any other right under or with respect to Bambu Intellectual Property, (B) fail to take commercially reasonable measures to protect the confidentiality of any Trade Secrets included in the Bambu Intellectual Property, or (C) disclose any Trade Secrets included in the Bambu Intellectual Property to any Person; or

      (vii)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

6.2    Access to Information.

      (a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Seller will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Seller, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities; provided, that (i) such access does not unreasonably interfere with the normal operations of Seller, (ii) such access will occur in such a manner as Seller reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, and (iii) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would require Seller to disclose any financial or proprietary information of or regarding the Affiliates of Seller (other than other Seller), (B) would waive any legal privilege or (C) would be in violation of applicable Laws; provided, that in the event that Seller does not

provide access to information in reliance on any of the preceding clauses, Seller shall use its commercially reasonable efforts to communicate, to the extent feasible, the applicable information in a way that would not violate the applicable restriction.

(b)     The information provided pursuant to this Section 6.2 will be used solely for the purpose of consummating the transactions contemplated hereby, and will be subject to the Confidentiality Obligations, which Confidentiality Obligations shall remain in effect until terminated in accordance with the Credit Agreement.  Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Obligations with respect to such access and any information furnished to Purchaser or any of its Advisors. Seller makes no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)     From and after the Closing for a period of three years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Seller and his Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) arising from or relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records), in each case, as may be reasonably required in connection with the preparation of the Seller's Tax Returns or any Governmental filing; provided, however, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Purchaser (including Purchaser's use of the Acquired Assets). In each case at Seller's expense, from and after the Closing, Purchaser will, and will cause its employees to, provide Seller with reasonable assistance, support and cooperation with wind-down and related activities (e.g., helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

6.3     Regulatory Approvals.

(a)     Seller will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to Section 6.3(b) and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.3(a) or Section 6.3(b) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)     Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the transactions contemplated by this Agreement, if any, (ii) cooperate with Seller in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings made by Seller pursuant to Section 6.3(a), and (iii) (A) supply promptly any additional information and documentary

13

material that may be requested in connection with the filings made pursuant to this <u>Section 6.3(b)</u> or <u>Section 6.3(a)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

6.4    <u>Reasonable Efforts; Cooperation</u>.

(a)    Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken and do, or cause to be done, all things necessary, proper or advisable to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)    The obligations of Seller pursuant to this Agreement, including this <u>Section 6.4</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases, the Sale Order), and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.5    <u>Further Assurances</u>. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

6.6    <u>Insurance Matters</u>. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.<u>Receipt of Misdirected Assets; Liabilities</u>.

(a)    From and after the Closing, if Seller holds or receives any right, property or asset that is an Acquired Asset, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to Seller, and such asset will be deemed the property of Seller held in trust by Purchaser for Seller until so transferred.

140825317v9

(b)    From and after the Closing, if Seller is subject to a Liability that should belong to Purchaser pursuant to the terms of this Agreement, Seller shall promptly transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to Seller pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to Seller, and Seller shall accept such Liability.

6.8    <u>Use of Name</u>. Seller acknowledges and agrees that, following the Closing, Purchaser shall exclusively own and have the right to use and license the Bambu Intellectual Property. Following the Closing, Seller shall cause the Bambu Debtors not to, directly or indirectly, use, register or apply for any Trademarks included in any Trademarks or Domain Names included in the Bambu Intellectual Property, any variations or derivatives thereof, or any names confusingly similar thereto. Without limiting the foregoing, as promptly as practicable after the Closing (and in no event later than 15 days after the Closing), Seller (as applicable) shall change its corporate legal name to one which does not include or bear any likeness to any Trademark included in the Bambu Intellectual Property or any variations or derivatives thereof, and deliver to Purchaser evidence of the same.

6.9    <u>Power of Attorney Maintenance of Intellectual Property</u>. Simultaneously with the execution of this Agreement, Seller is delivering to Purchaser a Power of Attorney substantially in the form attached hereto as <u>Exhibit A</u> (the "*POA*"), pursuant to which Purchaser shall, between the date hereof and the earlier of Closing and the termination of this Agreement in accordance with <u>Article VIII</u>, execute and deliver any such documents on behalf and in the name of the Bambu Debtors and to do all other lawfully permitted acts which are in Purchaser's judgement necessary or advisable to further the reinstatement, prosecution, registration and maintenance of intellectual property rights owned by the Bambu Debtors with respect to the Bambu Intellectual Property.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1    <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including an order staying the efficacy of the Sale Order, or any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is still in effect;

(b)    the Bankruptcy Court shall have entered the Sale Order which shall have become final and no longer subject to appeal; and

(c)    this Agreement shall become effective in accordance with its terms.

7.2    <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or

to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     there has been no material, adverse change in the condition or value of the Acquired Assets from the date hereof;

(b)     entry of an Order which may include the Sale Order (in form and substance satisfactory to Purchaser in its sole discretion) finding that the Exclusive License Agreement, dated February 15, 2019, between Bambu Vault, LLC and INQUE Holdings, LLC (the "*License Agreement*") has been properly terminated and that the Acquired Assets will be acquired by Purchaser at Closing free and clear of all Encumbrances, including any claims that may be asserted by INQUE Holdings, LLC or its Affiliates with respect to the License Agreement;

(c)     entry of a final Sale Order (in form and substance satisfactory to purchase in its sole discretion) that is no longer subject to appeal approving the Transaction by the United States Bankruptcy Court for the District of Massachusetts which is in form and substance acceptable to Purchaser);

(d)     the receipt of any regulatory approvals and third party consents to the transactions contemplated by this Agreement, on terms satisfactory to Purchaser;

(e)     (i) the representations and warranties made by Seller in Article III (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (provided, that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect and (ii) the representations and warranties set forth in Section 3.1 and Section 3.2 (collectively, the "*Fundamental Representations*") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date; and

(f)     Seller shall have performed and complied in all material respects with the covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to Closing; and

(g)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.3.

7.3     Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in Article IV shall be true and correct as of the Closing Date as though made on and as of the Closing Date, except as

16

would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement (provided, that representations and warranties that are made as of a specified date need be so true and correct only as of such date);

(b)    Purchaser shall have performed and complied in all material respects with the covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to Closing; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.22.

7.4    <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Seller may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

## ARTICLE VIII
## TERMINATION

8.1    <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Purchaser;

(b)    by written notice of either Purchaser or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; <u>provided</u> that no Party may terminate this Agreement under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)    by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before December 15, 2023 (the "***Outside Date***"); <u>provided</u>, that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement; <u>provided</u>, <u>further</u>, that the Outside Date may be extended by Purchaser at any time prior to the Outside Date upon written notice to Seller;

(d)    by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in <u>Section 7.3(a)</u> or <u>7.3(b)</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under

17

this Section 8.1(d) unless such breach has not been cured by the date which that the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)    by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) through 7.2(f) would not be satisfied; provided that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)    subject to Section 8.3, by written notice from Purchaser if Seller accepts or announces its intention to pursue one or more Alternative Transactions with one or more Persons other than Purchaser; or

(g)    by written notice from Purchaser to Seller, if Purchaser is not the prevailing party at the conclusion of the Auction.

8.2    Effect of Termination.  In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided, that Section 6.2(b), this Section 8.2 and Article X shall survive any such termination; provided, further, that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses resulting from any material Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). Subject to Section 10.111, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

8.3    Expense Reimbursement Upon Sale to Third Party.

(a)    In the event that an Alternative Transaction is consummated, Seller shall pay to Purchaser by wire transfer of immediately available funds on the Closing Date an amount equal to the IP Expense Reimbursement Amount *plus* the General Expense Reimbursement Amount.

(b)    "*IP Expense Reimbursement Amount*" means an amount equal to the reasonable and documented out-of-pocket costs and expenses incurred by Purchaser and its Affiliates in connection with the activities identified in Section 6.9, which amount shall not exceed $35,000.

(c)    "*General Expense Reimbursement Amount*" means an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of its counsel and any financial advisor) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, excluding, for the avoidance of doubt, the IP Expense Reimbursement Amount.

## ARTICLE IX
## TAXES

9.1    Transfer Taxes. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "*Transfer Taxes*") shall be borne by Purchaser. The Party required by Law to file a Tax Return with respect to such Transfer Taxes shall do so in the time and manner prescribed by Law, and the non-filing Party shall cooperate with the filing Party in the filing of such Tax Return and promptly reimburse the filing Party for its share of any Transfer Taxes upon receipt of evidence reasonably satisfactory to the non-filing Party of the amount of such Transfer Taxes. Each Party shall use commercially reasonable efforts to avail itself of any available exemptions from any such Transfer Taxes, and to cooperate with the other Parties in providing any information and documentation that may be necessary to obtain such exemptions.

9.2    Allocation of Purchase Price. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Seller, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets pursuant to a methodology that shall be determined by Purchaser prior to the Closing (the "*Allocation Methodology*"), which may be modified by Purchaser in its sole discretion upon written notice to Seller within 90 days of Closing. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of section 1313(a) of the Tax Code.

9.3    Cooperation. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

## ARTICLE X
## MISCELLANEOUS

10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and

agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for 5 years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for 5 years and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u>.

10.3    <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

Bambu Purchaser SPV, LLC
One BIC Way, Suite 1
Shelton, CT 06484-6299
Attention:    Chad Spooner
              Michelle Goglia
Email:        chad.spooner@bicworld.com
              michelle.goglia@bicworld.com

140825317v9

with a copy to (which shall not constitute notice):

Proskauer Rose LLP
1 International Pl.
Boston, MA 02110
Attention:    Chad Dale
             Steve Peck
Email:       cdale@proskauer.com
             speck@proskauer.com

Notices to Seller :

Bambu Vault LLC
1441 Main Street, Suite 610
Springfield, MA 01103
Attention:    Gary Weiner, Esquire
E-mail:      gweiner@Weinerlegal.com

10.4   Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the entry and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; provided, however, that Purchaser may assign any and all of its rights, title and interest in this Agreement, including the right of Purchaser to acquire all or any portion of the Acquired Assets, to one or more designees, Affiliates or assignees at its sole election.

10.5   Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6   Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7   Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract,

21

tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute.

10.8     <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9     <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    <u>Complete Agreement</u>. This Agreement, together with any other agreements expressly referred to herein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.11    <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.12</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.11</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Seller pursuant to this <u>Section 10.11</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting

140825317v9

damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 10.12, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus ten Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this Section 10.11 be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty made by Seller herein.

10.12    Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the transactions contemplated hereby and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "***Agreement Dispute***") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the United States federal courts for the Western District of Massachusetts (the "***Chosen Courts***"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.13    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY

140825317v9

SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.14   <u>Counterparts and PDF</u>. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.15   <u>Bulk Sales Laws</u>. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.16   <u>Seller's Representative</u>. Each Party agrees that Seller has the power and authority to unilaterally act on behalf of Seller and Bambu Debtors for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents and determinations on behalf of Seller and Bambu Debtors, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller or Bambu Debtor shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken on behalf of Seller or a Bambu Debtor.

140825317v9

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    <u>Certain Definitions</u>.

(a)    "*Action*" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

(b)    "*Advisors*" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)    "*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)    "*Alternative Transaction*" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Seller and its Affiliates or Purchaser and its Affiliates)acquires (i) beneficial ownership of a majority of the equity interests of Seller or (ii) all or any portion of the Acquired Assets, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, a liquidation or wind-down of Seller's estate shall not be an Alternative Transaction.

(e)    "*Bambu Intellectual Property*" means all Intellectual Property owned by the Bambu Debtors, including the Intellectual Property identified on <u>Schedule I</u> hereto.

(f)    "*Bambu Plan*" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case (a) that is sponsored, maintained or contributed to by a Bambu Debtor or any ERISA Affiliate or to which a Bambu Debtor or any ERISA Affiliate is obligated to contribute, or in which a Bambu Debtor or any ERISA Affiliate participates or participated, or (b) with respect to which a Bambu

Debtor or any ERISA Affiliate has or may have any Liability, contingent or otherwise, including as a result of any previously terminated plan, program, policy, agreement or arrangement.

(g)    [Reserved].

(h)    "***Business Day***" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(i)    "***COBRA***" means Part 6 of Subtitle I of ERISA, Section 4980B of the Tax Code, and any similar state Law.

(j)    "***Confidentiality Agreement***" means that certain Mutual Nondisclosure Agreement executed August 22, 2023 by Seller and BIC International Co. ("***BIC International***").

(k)    "***Confidentiality Obligations***" means the obligations of Purchaser, as an Affiliate of BIC International, under the Confidentiality Agreement.

(l)    "***Consent***" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(m)    "***Contract***" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, whether written or oral and other than a purchase order, service order, or sales order.

(n)    "***Documents***" means all of Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, ledgers, journals, title policies, registries, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(o)    "***Encumbrance***" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, license, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(p)    "***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

(q)    "***ERISA Affiliate***" means any trade of business or other entity (whether or not incorporated) that, together with Seller, would be deemed at any relevant time to be a "single employer" within the meaning of Section 414 of the Tax Code or Section 4001 of ERISA.

(r)    "*Excluded Taxes*" means (i) Taxes relating to or arising in connection with the Acquired Assets or the Assumed Liabilities with respect to (or relating to any event, election, circumstance or transaction occurring in) any Pre-Closing Tax Period, (ii) Taxes of or with respect to Seller or any of its Affiliates, (iii) any Transfer Taxes borne by Seller or its Affiliates, (iv) Taxes of any Person imposed on Purchaser or any of its Affiliates as a transferee of or successor to the Acquired Assets, by Contract or otherwise as a result of ownership of any of the Acquired Assets prior to or ending on the Closing Date or any event or transaction occurring prior to or ending on the Closing Date, and (v) any withholding Taxes imposed on or otherwise due with respect to any payment to Seller or any of its Affiliates under this Agreement.

(s)    "*GAAP*" means United States generally accepted accounting principles as in effect from time to time.

(t)    "*Governmental Authorization*" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(u)    "*Governmental Body*" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(v)    "*Intellectual Property*" means all rights in, to, arising out of, or associated with any intellectual or industrial property or other proprietary rights, interests or protections in any jurisdiction throughout the world, including all: (i) patents, patent disclosures, invention disclosures, patentable rights to inventions and designs, and applications therefor (whether provisional or non-provisional), including all divisional, continuations and continuations-in-part, and including renewals, reexaminations, extensions, restorations and reissues of the foregoing ("*Patents*"); (ii) trademarks, service marks, trade dress, corporate names, logos, fictitious business names, trade names, slogans, certifications marks, brands, and other source identifiers or other indicia of origin, together with all applications and registrations therefor and all goodwill associated with or symbolized by each of the foregoing ("*Trademarks*"); (iii) Internet domain names and registrations or applications for registrations thereof, and all social media accounts, profiles or user names (including "handles") and services related thereto (including those available through Facebook, Twitter, YouTube, Pinterest, Instagram, Snapchat, TikTok and similar platforms) ("*Social Media Accounts*"), whether or not Trademarks, all associated web addresses, Internet Protocol addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, whether or not Copyrights ("*Domain Names*"), Google Analytics accounts, and all content, analytics, documentation and other materials relating to any of the foregoing; (iv) copyrights, copyrightable works, and works of authorship (whether or not copyrightable), whether registered or unregistered, together with all applications, registrations and renewals therefor, including copyrights in software ("*Copyrights*"); (v) advertising and marketing materials, samples, artwork, photography, images, copy, catalogues, labels, brand books, style guides, retailer presentations, recordings and similar materials, and any other materials showing the heritage of any Trademarks or the business of the Bambu Debtors;

27

(vi) proprietary and confidential know-how, trade secrets, and proprietary confidential information, including any processes, drawings, schematics, technical plans, inventions (whether or not patentable), invention disclosures, discoveries, improvements, technology, methods, algorithms, tools, processes, techniques, formulae, prototypes, models, designs, specifications, databases, data compilations and collections, customer data and associated information, supplier or vendor lists and associated information, business and marketing plans, pricing and cost information, and other confidential business information ("***Trade Secrets***"); (vii) software and mask works; (viii) rights of publicity, personality rights and similar rights (including those relating to advertising or marketing of any products and services); (ix) registrations and applications for any of the foregoing; and (x) rights to make claims for past, present and future infringement, misappropriation and other violation of the foregoing.

(w)    "***Law***" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, Order, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(x)    "***Liability***" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(y)    "***Material Adverse Effect***" means any matter, event, change, development, occurrence, circumstance or effect (each, an "***Effect***") that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; <u>provided</u> that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any Effect in, arising from or relating to general business or economic conditions affecting the industry in which Seller and its Affiliates operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to the decline or rise in

28

price of any currency or any supplies necessary to or used in the provision of services by Seller (including any resulting inability to meet customer demands or fulfill purchase orders and any resulting breaches of Contracts); (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body (including, for the avoidance of doubt, any such items related to Section 6.4) and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii) Effects in, arising from or relating to (A) the taking of any action expressly permitted or contemplated by this Agreement or at the written request of Purchaser or its Affiliates, (B) the failure to take any action if such action is expressly prohibited by this Agreement or (C) the negotiation, announcement, or pendency of this Agreement or the transactions contemplated hereby, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of the Bambu Debtors with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the transactions contemplated hereby; (ix) Effects in, arising from or relating to any action required to be taken under any existing Contract to which Seller (or any of their assets or properties) is bound; (x) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xi) the Effect of any action taken by Purchaser or its Affiliates with respect to the transactions contemplated by this Agreement or the financing thereof or any breach by Purchaser of this Agreement; or (xii) (A) the commencement or pendency of the Bankruptcy Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, or (2) the Sale Order or the reorganization or liquidation of Seller; or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith.

(z)    "*Order*" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(aa)    "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(bb)    "*Pre-Closing Tax Period*" means any taxable period (or portion thereof) ending on or before the Closing Date, including the portion of any taxable period that includes but does not end on the Closing Date.

(cc)    "*Purchaser Group*" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(dd)    "*Registered Intellectual Property*" means all Bambu Intellectual Property that has been issued, registered, applied for or filed by, to or with any Governmental Body or authorized private registrar in any jurisdiction, including issued, registered, applied-for or filed (a) Patents, (b) Trademarks, (c) Copyrights and (d) Domain Names.

(ee)    "*Sale Order*" means the sale Order or Orders (i) approving this Agreement and the terms and conditions hereof, including pursuant to sections 363 and 365 of the Bankruptcy Code and (ii) approving and authorizing Seller to consummate the transactions contemplated hereby, substantially in the form attached hereto as Exhibit B.

(ff)    "*Software*" means all (i) computer software, computer programs, applications, utilities, development tools, operating systems, middleware or firmware, application programming interfaces, diagnostics, databases and embedded systems, in any form or medium, including source code, object code and executable code, all associated libraries, and all databases used with, or used to develop, any of the foregoing and (ii) documentation, protocols and specifications, including user manuals and other training documentation, related thereto.

(gg)    "*Subsidiary*" or "*Subsidiaries*" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(hh)    "*Tax*" or "*Taxes*" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ii)    "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

(jj)    "*Tax Return*" means any return, claim for refund, report, statement or information return relating to Taxes, including any schedule or attachment thereto, and including any amendments thereof.

(kk)    "*Transaction Agreements*" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

140825317v9

(ll)    "***Willful Breach***" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

11.2    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

[*Signature Pages Follow*]

31

140825317v9

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER:**

**BAMBU PURCHASER SPV, LLC**

By: _Chad Spooner_
          09D8C786D0DE47E...
Name:  Chad Spooner
Title:   President

**SELLER**:

**GARY M. WEINER, IN HIS CAPACITY AS
CHAPTER 7 TRUSTEE-IN-BANKRUPTCY
FOR BAMBU GLOBAL LLC AND BAMBU
VAULT LLC**

_____

Gary Weiner

## SCHEDULE I

## LIST OF IP ASSETS

**Patents:**

| Title | Jurisdiction | Status | App. No. | Priority or Filing Date | Patent No. | Issue Date |
|---|---|---|---|---|---|---|
| Tissue Marking Compositions | US | Issued | 11898569 | 9/13/2007 | 7,842,128 | 11/30/2010 |
| Tissue Marking and Methods for Reversibly Marking Tissue Employing the Same | US | Issued | 11/898570 | 9/13/2007 | 8,039,193 | 10/18/2011 |
| Tissue Marking and Methods for Reversibly Marking Tissue Employing the Same | US | Issued | 13/233724 | 9/15/2011 | 8,258,080 | 9/4/2012 |
| Tattoo Ink Formulation / Encapsulated, Dyes that Pass Cytotoxicity, Leaching Process / Process Black/CMYK | US | To be filed | N/A | N/A | N/A | N/A |
| SAFE PARTICLES FOR THE INTRODUCTION OF USEFUL CHEMICAL AGENTS IN THE BODY WITH CONTROLLED ACTIVATION (Tattoo)  And all corresponding national phases including the ones to be reinstated. Deadline mentioned are final and not extendible. | WIPO | Lapsed | PCT/US20/19346 | 2/21/2020 | N/A | N/A |
| | US | Pending | 17/432,904 | 2/21/2020 | N/A | N/A |
| | US | To be reinstated | 17/432,902 | 2/21/2020 | N/A | N/A |
| | EP | To be reinstated – Deadline 11 December, 2023 | 20759300 | 2/21/2020 | N/A | N/A |
| | CN | To be reinstated – Deadline 7 November, 2023 | 202080025020  112021016562 | 2/21/2020 | N/A | N/A |
| | BR | Next Annuity due 21 November, 2023 | | 2/21/2020 | N/A | N/A |
| | CA | Next Annuity due 21 February, 2024 | 3130756 | 2/21/2020 | N/A | N/A |

**Trademarks**:

| Country | Trademark | Application Date | Application No. | Reg. Date | Reg. No. | Status |
|---|---|---|---|---|---|---|
| UNITED STATES | CEREUS | 19 Oct 2007 | 77308271 | 3 Feb 2009 | 3570620 | REGISTERED |
| UNITED STATES | COLOR FOR A CHANGE | 9 Apr 2007 | 77151841 | 26 Aug 2008 | 3493389 | REGISTERED |
| UNITED STATES | PERFORMANCE INDICATOR | 23 Oct 2007 | 77310619 | 3 Jun 2008 | 3440462 | REGISTERED |
| UNITED STATES | PI and Design  | 22 Oct 2007 | 77310085 | 3 Jun 2008 | 3440460 | REGISTERED |

**<u>Copyrights</u>**:

None.

**<u>Domain Names</u>**:

None.

# **EXHIBIT A**

## **POWER OF ATTORNEY**

*See attached.*

*Execution Version*

# POWER OF ATTORNEY

This Power of Attorney ("POA"), effective as of October 30, 2023, is by and between Bambu Vault LLC, a Delaware limited liability company ("Bambu") and Bambu Purchaser SPV, LLC, a Delaware corporation ("BIC").

WHEREAS, Bambu and BIC have entered into that certain Asset Purchase Agreement, dated as of October 30, 2023 (as amended, supplemented and/or modified from time to time, the "APA");

WHEREAS, pursuant to the APA, Bambu will be assigning to BIC, at the closing of the transaction contemplated by the APA (the "Closing"), its entire worldwide right, title and interest in, to and under intellectual property rights owned by Bambu (the "Assigned IP"), and Bambu and BIC desire for BIC to, prior to such Closing, take various actions to reinstate, prosecute, register and maintain such intellectual property rights in Bambu's name; and

WHEREAS, in furtherance of the foregoing, Bambu desires to grant to BIC, and BIC desires to receive from Bambu, power of attorney as set forth herein;

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged:

Bambu hereby irrevocably grants to BIC power of attorney during the period commencing on the Effective Date and ending on the date on which the APA is terminated or the date of the Closing, whichever occurs first, to execute and deliver any such documents on Bambu's behalf in Bambu's name and to do all other lawfully permitted acts to further the reinstatement, prosecution, registration and maintenance of intellectual property rights owned by Bambu, to the full extent permitted by law. The power of attorney is coupled with an interest and shall not be impacted by Bambu's subsequent incapacity.

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this POA to be duly executed and delivered as of the date first written above.

**BAMBU VAULT LLC**

By: Gary M. Weiner, in his capacity as
Chapter 7 Trustee-in-Bankruptcy for
Bambu Vault LLC

By: _____
Name: Gary M. Weiner

**BAMBU PURCHASER SPV, LLC**

By: _____
Name: Chad Spooner
Title: President

**<u>EXHIBIT B</u>**

**SALE ORDER**

*See attached.*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

|  |  |
|---|---|
| In re:<br><br>BAMBU GLOBAL LLC,<br><br>       Debtor | Chapter 7<br><br>Case No.: 22-40323-EDK<br><br>(Jointly Administered) |
| In re:<br><br>BAMBU VAULT LLC,<br><br>       Debtor | Chapter 7<br><br>Case No.: 22-40324-EDK<br><br>**Re: ECF No. [___]** |

**[PROPOSED] ORDER (I) APPROVING THE SALE OF CERTAIN ESTATE ASSETS
FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS,
AND ENCUMBRANCES, (II) AUTHORIZING THE TRUSTEE TO ENTER
INTO AND PERFORM ITS OBLIGATIONS UNDER THE ASSET
PURCHASE AGREEMENT AND (III) GRANTING RELATED RELIEF**

Upon consideration of the *Trustee's Motion (I) For Authority to Sell Certain Estate Assets Pursuant to Section 363 of the Bankruptcy Code, Free and Clear of Liens, Claims and Interests, (II) Authorize the Trustee to Enter Into and Perform Its Obligations Under That Certain Asset Purchase Agreement, (III) Requesting a Hearing on the Proposed Sale, and (IV) Granting Related Relief* (the "Sale Motion"),[1] pursuant to which Gary M. Weiner, Chapter 7 Trustee (the "Trustee") for Bambu Global LLC and Bambu Vault LLC (collectively, the "Debtors") requested that this Court authorize the Debtors' sale (the "Sale") of certain assets (the "Acquired Assets") of the Debtors' estate, including without limitation: (i) all of the Debtors' intellectual property (the "Bambu Intellectual Property"); (ii) all agreements pursuant to which the Debtors are granted a

---

[1] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Sale Motion or the APA (as applicable).

license, sublicense, covenant not to sue or other right with respect to any third party intellectual property; (iii) 100% of the Debtors' membership interest in INQUE Holdings, LLC, a Massachusetts limited liability company ("INQUE"); and (iv) certain other assets, as set forth in Section 1.1 of that certain Asset Purchase Agreement dated October 30, 2023 (the "APA") between the Trustee and Bambu Purchaser SPV, LLC., a corporation organized under the laws of the State of Delaware (the "Purchaser"), to Purchaser (or its permitted designee); and the Court having found and determined that the relief sought in the Sale Motion is in the best interest of the Debtors estate and all parties in interest, and that the legal and factual bases set forth in support of the Sale Motion establish good cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

<u>**Jurisdiction, Venue, and Final Order**</u>

A.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This sale order (the "Sale Order") constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding

2

pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Notice of the Sale Motion, Sale Hearings, Asset Purchase Agreement and Sale**

D.       Proper, timely, adequate and sufficient notice of the Sale Motion, the Preliminary Sale Hearing, the final Sale Hearing, the APA and the Sale has been provided in accordance with sections 102(1), 105, and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007 and 9014. The foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Sale Hearing, the APA, or the Sale is required.

E.       A reasonable opportunity to object or to be heard regarding the relief requested in the Sale Motion was afforded to all interested persons and entities.

**Best Interests of the Debtors Estate**

F.       Approval of the APA, and the consummation of the Sale contemplated thereby, is in the best interests of the Debtors estate, and other parties in interest. The Trustee has demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale and the performance of their obligations under the APA. By order dated _____ [ECF] the Court established November ___ as the deadline by which creditors and parties in interest could either object to the proposed Sale (the "Objection Deadline") or submit a written counteroffer to purchase the Acquired Assets (the "Counteroffer Deadline"). [Further, prior to the Objection Deadline and Counteroffer Deadline, the Trustee did not receive a higher or otherwise better offer to purchase the Acquired Assets. The sale process conducted by the Trustee resulted in the highest or otherwise best value for the Acquired Assets for the Debtors and their estates, was in the best

interest of the Debtors, their estates, their creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result.]

G.      Entry of an order approving the APA and all the provisions thereof is a necessary condition precedent to Purchaser's consummation of the Sale, as set forth in the APA.

### **Good Faith of Purchaser**

H.      The consideration to be paid by the Purchaser under the APA was negotiated at arm's-length, in good faith and without collusion pursuant to section 363(m) of the Bankruptcy Code and constitutes reasonably equivalent value and fair and adequate consideration for the Acquired Assets.  Specifically: (i) all payments made by the Purchaser in connection with the Sale have been disclosed in the APA; (ii) no common identity of directors, officers, or controlling stockholders exists among the Purchaser and the Debtors, or the Trustee; (iii) the negotiation and execution of the APA was at arm's-length and in good faith; (iv) the Purchaser did not in any way induce or cause the chapter 7 filing of the Debtors; and (v) the Purchaser has not acted in a collusive manner with any person.  The Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the APA.  The terms and conditions set forth in the APA are fair and reasonable under the circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Trustee, the Debtors or their creditors under any applicable laws.

I.      The Trustee and the Purchaser have acted in good faith.  The APA and the transactions contemplated therein, were negotiated, proposed, and entered into by the Trustee and the Purchaser in good faith, without collusion or fraud, and from arm's-length bargaining positions.  The Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby.

4

**No Fraudulent Transfer**

J.      The consideration provided by the Purchaser pursuant to the APA for its purchase
of the Acquired Assets and the assumption of the Assumed Liabilities constitutes reasonably
equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent
Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States,
any state, territory, possession, or the District of Columbia.

K.      Neither the Purchaser nor its past, present and future subsidiaries, parents,
divisions, affiliates, agents, representatives, attorneys, successors, designees and assigns,
(collectively, the "Purchaser Parties") is a continuation of the Debtors or their respective estates
and no Purchaser Party is holding itself out to the public as a continuation of the Debtors or their
respective estates and the Sale does not amount to a consolidation, merger, or de facto merger of
the Purchaser (or any other Purchaser Party) and the Debtors.

**Validity of Transfer**

L.      The Trustee has authorized the execution and delivery of the APA and the Sale of
the Acquired Assets to the Purchaser (or its designee).  In his capacity as the duly appointed
Trustee for each of the Debtors, pursuant to Section 323(a) of the Bankruptcy Code, the Trustee
(i) has full corporate power and authority to execute and deliver the APA and all other documents
contemplated thereby, as applicable, (ii) has all of the power and authority necessary to
consummate the Sale, and (iii) has taken all action necessary to authorize and approve the APA
and to consummate the Sale, and no further consents or approvals, other than those expressly
provided for in the APA, are required for the Trustee to consummate the transactions
contemplated by the APA, except as otherwise set forth in the APA.  The Acquired Assets

constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy

Code and title thereto is presently vested in the Debtors' estates.

M.      By written notice dated September 15, 2023, the Trustee gave notice to INQUE that

he was thereby terminating an exclusive intellectual property licensing agreement between Debtor

entity, Bambu Vault LLC, and INQUE Holdings LLC ("INQUE") dated February 15, 2019

(including any and all modifications and amendments, the "License Agreement").  The termination

notice advised INQUE that it had materially breached its obligations under the License Agreement.

Among other defaults, the Trustee claimed that INQUE had repeatedly failed to deliver certified

Quarterly Reports and that it had repeatedly failed to pay certain sublicense fees due and owing to

the Debtors estate, including with respect to a sublicense agreement with MT.DERM GmbH (the

"MT DERM Sublicense").  The License Agreement provided INQUE with a 60-day period within

which to cure its defaults.  No such cure was made (or even attempted).  As a result, the License

Agreement terminated on or about November 15, 2023.

N.      As a consequence of termination, any interest that INQUE previously had in the

intellectual property covered by the License Agreement was extinguished, and upon

consummation of the Sale contemplated by the APA, the Trustee will validly transfer all of the

Debtors right, title and interest in the Bambu Intellectual Property free and clear of any claim or

interest that could have been asserted under the License Agreement.

### Section 363(f) Is Satisfied

O.      The Sale of the Acquired Assets to the Purchaser (or any designee) under the terms

of the APA satisfies the applicable provisions of section 363(f) of the Bankruptcy Code such that

the Sale of the Acquired Assets will be free and clear of any and all liens, claims, encumbrances

and interests and will not subject any Purchaser Party to liability for any liens, claims,

encumbrances or interests whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the APA with respect to the Assumed Liabilities.  All holders of liens, claims, encumbrances or interests who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of liens, claims, encumbrances or interests are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their liens, claims, encumbrances and interests, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they assert liens, claims, encumbrances or interests, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable.  Those holders of claims who did object and that have an interest in the Acquired Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

P.      The transfer of the Acquired Assets to the Purchaser (or its designee) under the APA will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and interest in and to the Acquired Assets free and clear of all liens, claims, encumbrances and interests, except as expressly provided in the APA with respect to the Assumed Liabilities. The Trustee may sell the Debtors interests in the Acquired Assets free and clear of all liens, claims, encumbrances and interests because, in each case, one or more of the standards set forth in section 363(f) has been satisfied.  The Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby, including, without limitation, the Sale and the assumption and assignment of the Acquired Assets (i) if the transfer of the Acquired Assets were not free and clear of all interest of any kind or nature whatsoever, including, without

7

limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise or (ii) if the Purchaser or any of its affiliates or designees would, or in the future could, be liable for any interests, including, without limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, in each case subject only to the Assumed Liabilities.  Not transferring the Acquired Assets free and clear of all interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise (subject only to the Assumed Liabilities), would adversely impact the Trustee's efforts to maximize the value of the Debtors estates.

### Prompt Consummation

Q.      Based on the record of the Preliminary Sale Hearing, and the final Sale Hearing, and for the reasons stated on the record at the Preliminary Sale Hearing and final Sale Hearing, the sale of the Acquired Assets must be approved and consummated promptly to preserve the value of the Acquired Assets.  Time, therefore, is of the essence in effectuating the APA.  As such, the Trustee and the Purchaser intend to close the sale of the Acquired Assets as soon as reasonably practicable.  The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the APA.  Accordingly, there is sufficient cause to waive the stay provided in the Bankruptcy Rules 6004(h).

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

### General Provisions

1.      The Sale Motion is GRANTED to the extent set forth herein.

2.      All objections to or reservation of rights with respect to the Sale Motion or the relief requested therein that have not been withdrawn or resolved are overruled with prejudice.  All persons and entities who did not object or withdraw their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      The APA, and all terms and conditions thereof, are hereby approved in all respects. The failure to specifically include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision.

**<u>Transfer of the Acquired Assets as set forth in the Asset Purchase Agreement</u>**

4.      The Trustee is authorized and directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Sale in accordance with the terms and conditions set forth in the APA and this Sale Order, and (b) take all further actions and execute and deliver any and all additional instruments and documents that may be necessary or appropriate to implement the APA and consummate the Sale in accordance with the terms thereof, all without further order of the Court.

5.      The Purchaser is not acquiring any of the Excluded Assets or assuming any of the Excluded Liabilities.

6.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Trustee to transfer the Acquired Assets to the Purchaser (or its designee) in accordance with the APA and this Sale Order.

7.      At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Acquired Assets shall be immediately vested in the Purchaser (or its designee) pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code.  Such transfer shall constitute a legal,

valid, enforceable, and effective transfer of the Acquired Assets.  All persons or entities, presently or at or after the Closing, in possession of some or all of the Acquired Assets, are directed to surrender possession of any and all portions of the Acquired Assets to the Purchaser (or its designee) or its respective designees on the Closing or at such time thereafter as the Purchaser (or its designee) may request.

8.      This Sale Order (a) shall be effective as a determination that, as of the Closing, (i) no claims other than the Assumed Liabilities will be assertable against any Purchaser Party or any of its respective assets, (ii) the Acquired Assets shall have been transferred to the Purchaser (or its designee) free and clear of all liens, claims, encumbrances and interests subject only to the Assumed Liabilities, and (iii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.  In particular, the Acquired Assets are sold free and clear of any rights, claims encumbrances or interest that relate to or arise or in connection with under the License Agreement, which was properly terminated by the Trustee.  All liens, claims, encumbrances and interests, on the Acquired Assets shall attach to the proceeds of the Sale ultimately attributable to the property against which such liens, claims, encumbrances and interests, applied or other specifically dedicated funds, in the same order of priority and with the

same validity, force, and effect that such liens, claims, encumbrances and interests, applied prior

to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable,

or as otherwise provided herein.

9.      Except as otherwise provided in the APA, all persons and entities (and their

respective successors and assigns), including, but not limited to, all debt security holders, equity

security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers,

vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising

under or out of, in connection with, or in any way relating to, the Debtors estate, the Acquired

Assets, and the ownership, sale, or operation of the Acquired Assets prior to Closing or the transfer

of the Acquired Assets to the Purchaser (or its designee), are hereby forever barred, estopped, and

permanently enjoined from asserting such claims against any Purchaser Party and its property

(including, without limitation, the Acquired Assets).  Following the Closing, no holder of any

claim or interest shall interfere with the Purchaser's (or its designee's) title to or use and enjoyment

of the Acquired Assets based on or related to any such claim or interest, or based on any action the

Trustee may take in the Debtors Chapter 7 cases.

10.     If any person or entity that has filed financing statements, mortgages, mechanic's

claims, lis pendens, or other documents or agreements evidencing claims against the Debtors estate

or in the Acquired Assets shall not have delivered to the Trustee prior to the Closing of the Sale,

in proper form for filing and executed by the appropriate parties, termination statements,

instruments of satisfaction, and/or releases of all liens, claims, encumbrances and interests, that

the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then only

with regard to the Acquired Assets that are purchased by the Purchaser (or its designee) pursuant

to the APA and this Sale Order, (a) the Trustee is hereby authorized and directed to execute and

file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Acquired Assets, (b) the Purchaser (or its designee) is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims, encumbrances and interests, against the Purchaser Parties and the Acquired Assets, and (c) upon consummation of the Sale, the Purchaser (or its designee) may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all liens, claims, encumbrances and interests, that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Acquired Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and assignment of the Acquired Assets free and clear of liens, claims, encumbrances and interests, shall be self-executing and neither the Trustee nor the Purchaser (or its designee) shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

## No Successor or Transferee Liability

11.    No Purchaser Party shall be deemed, as a result of any action taken in connection with the APA, the consummation of the Sale contemplated by the APA, or the transfer, operation, or use of the Acquired Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors

including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, the Employee Retirement Income Security Act of 1974 ("ERISA"), tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation.

12.    Immediately prior to the Closing, the Purchaser was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or controlling stockholders existed between the Purchaser, the Trustee and the Debtors.

13.    Other than as expressly set forth in the APA, no Purchaser Party shall have any responsibility for (a) any liability or other obligation of the Debtors or related to the Acquired Assets or (b) any claims against the Debtors or any of their predecessors or affiliates.  Except as expressly provided in the APA with respect to the Purchaser, no Purchaser Party shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as defined herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, liabilities on account of (a) any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the

Acquired Assets or the Assumed Liabilities prior to the Closing or in respect of pre-Closing periods or (b) any plan, agreement, practice, policy, or program, whether written or unwritten, providing for pension, retirement, health, welfare, compensation or other employee benefits which is or has been sponsored, maintained or contributed to by any Debtor or with respect to which any Debtor has any liability, whether or not contingent, including, without limitation, any "multiemployer plan" (as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of ERISA) to which any Debtor has at any time contributed, or had any obligation to contribute. No Purchaser Party shall have any liability or obligation under any applicable law, including, without limitation, (a) the WARN Act (29 U.S.C. §§ 2101 et seq.), (b) the Comprehensive Environmental Response Compensation and Liability Act, (c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (the "NLRA"), or (f) any foreign, federal, state, or local labor, employment or environmental law, by virtue of the Purchaser's purchase of the Acquired Assets, or assumption of the Assumed Liabilities.

14.     Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against any Purchaser Party or their respective assets (including, without limitation, the Acquired Assets), with respect to any (a) claim in these Chapter 7 cases or in connection with or related to the Sale or the Debtors or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b):  (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest,

or encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Acquired Assets or conduct any of the businesses operated with respect to such assets.

## Good Faith of Purchaser

15.     The Sale contemplated by the Purchase Agreement is undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

16.     Neither the Trustee nor the Purchaser have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Acquired Assets under the APA is fair and reasonable, and the Sale may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

## Other Provisions

17.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court, (a) to allow the Purchaser to give the Trustee any notice provided for in the APA, (b) to allow the Purchaser to take any and all actions permitted by the APA in accordance with the terms and conditions thereof,

including, without limitation, effectuating the Sale and the other transactions contemplated by the APA and (c) to otherwise implement the terms and provisions of the APA and this Sale Order.

18.     The terms and provisions of the APA, and this Sale Order shall be binding in all respects upon the Trustee, the Debtors, their affiliates, their estates, all creditors of (whether known or unknown) and holders of equity interests in any Debtor, any holders of claims against or on all or any portion of the Acquired Assets, the Purchaser Parties, and all of their respective successors and assigns including, but not limited to, the Trustee and any subsequent trustee(s), examiner(s), or receiver(s) appointed in any of the Debtors' Chapter 7 cases under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding. The APA shall not be subject to rejection or avoidance by the Trustee, the Debtors creditors, their shareholders, or any subsequent trustee(s), examiner(s), or receiver(s).

19.     Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

20.     The APA and the Sale contemplated hereunder shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

21.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

22.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, and 9014 or otherwise, the terms and conditions of this Sale Order shall be effective immediately upon entry and the Trustee and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Order.

23.     To the extent there is any conflict between the terms of this Sale Order and the APA, the terms of this Sale Order shall control.

24.     The Court shall retain exclusive jurisdiction with respect to the terms and provisions of this Sale Order and the APA.


Dated:_____      _____
                                                    Honorable Elizabeth D. Katz
                                                    Chief United States Bankruptcy Judge

**<u>Exhibit C</u>**

Proposed Sale Order

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>BAMBU GLOBAL LLC,<br><br>    Debtor | Chapter 7<br><br>Case No.: 22-40323-EDK<br><br>(Jointly Administered) |
| In re:<br><br>BAMBU VAULT LLC,<br><br>    Debtor | Chapter 7<br><br>Case No.: 22-40324-EDK<br><br>**Re: ECF No. [____]** |

**[PROPOSED] ORDER (I) APPROVING THE SALE OF CERTAIN ESTATE ASSETS
FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS,
AND ENCUMBRANCES, (II) AUTHORIZING THE TRUSTEE TO ENTER
INTO AND PERFORM ITS OBLIGATIONS UNDER THE ASSET
PURCHASE AGREEMENT AND (III) GRANTING RELATED RELIEF**

Upon consideration of the *Trustee's Motion (I) For Authority to Sell Certain Estate Assets Pursuant to Section 363 of the Bankruptcy Code, Free and Clear of Liens, Claims and Interests, (II) Authorize the Trustee to Enter Into and Perform Its Obligations Under That Certain Asset Purchase Agreement, (III) Requesting a Hearing on the Proposed Sale, and (IV) Granting Related Relief* (the "Sale Motion"),[1] pursuant to which Gary M. Weiner, Chapter 7 Trustee (the "Trustee") for Bambu Global LLC and Bambu Vault LLC (collectively, the "Debtors") requested that this Court authorize the Debtors' sale (the "Sale") of certain assets (the "Acquired Assets") of the Debtors' estate, including without limitation: (i) all of the Debtors' intellectual property (the "Bambu Intellectual Property"); (ii) all agreements pursuant to which the Debtors are granted a

---

[1] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Sale Motion or the APA (as applicable).

license, sublicense, covenant not to sue or other right with respect to any third party intellectual property; (iii) 100% of the Debtors' membership interest in INQUE Holdings, LLC, a Massachusetts limited liability company ("INQUE"); and (iv) certain other assets, as set forth in Section 1.1 of that certain Asset Purchase Agreement dated October 30, 2023 (the "APA") between the Trustee and Bambu Purchaser SPV, LLC., a corporation organized under the laws of the State of Delaware (the "Purchaser"), to Purchaser (or its permitted designee); and the Court having found and determined that the relief sought in the Sale Motion is in the best interest of the Debtors estate and all parties in interest, and that the legal and factual bases set forth in support of the Sale Motion establish good cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

**<u>Jurisdiction, Venue, and Final Order</u>**

A.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    This sale order (the "Sale Order") constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding

pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute

conclusions of law, they are adopted as such.  To the extent any of the following conclusions of

law constitute findings of fact, they are adopted as such.

### Notice of the Sale Motion, Sale Hearings, Asset Purchase Agreement and Sale

D.      Proper, timely, adequate and sufficient notice of the Sale Motion, the Preliminary

Sale Hearing, the final Sale Hearing, the APA and the Sale has been provided in accordance with

sections 102(1), 105, and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007

and 9014.  The foregoing notice was good, sufficient, and appropriate under the circumstances,

and no other or further notice of the Sale Motion, the Sale Hearing, the APA, or the Sale is required.

E.      A reasonable opportunity to object or to be heard regarding the relief requested in

the Sale Motion was afforded to all interested persons and entities.

### Best Interests of the Debtors Estate

F.      Approval of the APA, and the consummation of the Sale contemplated thereby, is

in the best interests of the Debtors estate, and other parties in interest.  The Trustee has

demonstrated good, sufficient, and sound business reasons and justifications for entering into the

Sale and the performance of their obligations under the APA.  By order dated _____ [ECF] the

Court established November ___ as the deadline by which creditors and parties in interest could

either object to the proposed Sale (the "Objection Deadline") or submit a written counteroffer to

purchase the Acquired Assets (the "Counteroffer Deadline").  [Further, prior to the Objection

Deadline and Counteroffer Deadline, the Trustee did not receive a higher or otherwise better offer

to purchase the Acquired Assets.  The sale process conducted by the Trustee resulted in the highest

or otherwise best value for the Acquired Assets for the Debtors and their estates, was in the best

interest of the Debtors, their estates, their creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result.]

G.     Entry of an order approving the APA and all the provisions thereof is a necessary condition precedent to Purchaser's consummation of the Sale, as set forth in the APA.

**<u>Good Faith of Purchaser</u>**

H.     The consideration to be paid by the Purchaser under the APA was negotiated at arm's-length, in good faith and without collusion pursuant to section 363(m) of the Bankruptcy Code and constitutes reasonably equivalent value and fair and adequate consideration for the Acquired Assets.  Specifically: (i) all payments made by the Purchaser in connection with the Sale have been disclosed in the APA; (ii) no common identity of directors, officers, or controlling stockholders exists among the Purchaser and the Debtors, or the Trustee; (iii) the negotiation and execution of the APA was at arm's-length and in good faith; (iv) the Purchaser did not in any way induce or cause the chapter 7 filing of the Debtors; and (v) the Purchaser has not acted in a collusive manner with any person.  The Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the APA. The terms and conditions set forth in the APA are fair and reasonable under the circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Trustee, the Debtors or their creditors under any applicable laws.

I.     The Trustee and the Purchaser have acted in good faith.  The APA and the transactions contemplated therein, were negotiated, proposed, and entered into by the Trustee and the Purchaser in good faith, without collusion or fraud, and from arm's-length bargaining positions.  The Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby.

4

**No Fraudulent Transfer**

J.      The consideration provided by the Purchaser pursuant to the APA for its purchase of the Acquired Assets and the assumption of the Assumed Liabilities constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

K.      Neither the Purchaser nor its past, present and future subsidiaries, parents, divisions, affiliates, agents, representatives, attorneys, successors, designees and assigns, (collectively, the "Purchaser Parties") is a continuation of the Debtors or their respective estates and no Purchaser Party is holding itself out to the public as a continuation of the Debtors or their respective estates and the Sale does not amount to a consolidation, merger, or de facto merger of the Purchaser (or any other Purchaser Party) and the Debtors.

**Validity of Transfer**

L.      The Trustee has authorized the execution and delivery of the APA and the Sale of the Acquired Assets to the Purchaser (or its designee).  In his capacity as the duly appointed Trustee for each of the Debtors, pursuant to Section 323(a) of the Bankruptcy Code, the Trustee (i) has full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, as applicable, (ii) has all of the power and authority necessary to consummate the Sale, and (iii) has taken all action necessary to authorize and approve the APA and to consummate the Sale, and no further consents or approvals, other than those expressly provided for in the APA, are required for the Trustee to consummate the transactions contemplated by the APA, except as otherwise set forth in the APA.  The Acquired Assets

constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy

Code and title thereto is presently vested in the Debtors' estates.

M.      By written notice dated September 15, 2023, the Trustee gave notice to INQUE that

he was thereby terminating an exclusive intellectual property licensing agreement between Debtor

entity, Bambu Vault LLC, and INQUE Holdings LLC ("INQUE") dated February 15, 2019

(including any and all modifications and amendments, the "License Agreement").  The termination

notice advised INQUE that it had materially breached its obligations under the License Agreement.

Among other defaults, the Trustee claimed that INQUE had repeatedly failed to deliver certified

Quarterly Reports and that it had repeatedly failed to pay certain sublicense fees due and owing to

the Debtors estate, including with respect to a sublicense agreement with MT.DERM GmbH (the

"MT DERM Sublicense").  The License Agreement provided INQUE with a 60-day period within

which to cure its defaults.  No such cure was made (or even attempted).  As a result, the License

Agreement terminated on or about November 15, 2023.

N.      As a consequence of termination, any interest that INQUE previously had in the

intellectual property covered by the License Agreement was extinguished, and upon

consummation of the Sale contemplated by the APA, the Trustee will validly transfer all of the

Debtors right, title and interest in the Bambu Intellectual Property free and clear of any claim or

interest that could have been asserted under the License Agreement.

## Section 363(f) Is Satisfied

O.      The Sale of the Acquired Assets to the Purchaser (or any designee) under the terms

of the APA satisfies the applicable provisions of section 363(f) of the Bankruptcy Code such that

the Sale of the Acquired Assets will be free and clear of any and all liens, claims, encumbrances

and interests and will not subject any Purchaser Party to liability for any liens, claims,

6

encumbrances or interests whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the APA with respect to the Assumed Liabilities.  All holders of liens, claims, encumbrances or interests who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of liens, claims, encumbrances or interests are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their liens, claims, encumbrances and interests, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they assert liens, claims, encumbrances or interests, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable.  Those holders of claims who did object and that have an interest in the Acquired Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

P.      The transfer of the Acquired Assets to the Purchaser (or its designee) under the APA will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and interest in and to the Acquired Assets free and clear of all liens, claims, encumbrances and interests, except as expressly provided in the APA with respect to the Assumed Liabilities. The Trustee may sell the Debtors interests in the Acquired Assets free and clear of all liens, claims, encumbrances and interests because, in each case, one or more of the standards set forth in section 363(f) has been satisfied.  The Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby, including, without limitation, the Sale and the assumption and assignment of the Acquired Assets (i) if the transfer of the Acquired Assets were not free and clear of all interest of any kind or nature whatsoever, including, without

limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise or (ii) if the Purchaser or any of its affiliates or designees would, or in the future could, be liable for any interests, including, without limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, in each case subject only to the Assumed Liabilities.  Not transferring the Acquired Assets free and clear of all interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative or vicarious liability or any similar theory and/or applicable state or federal law or otherwise (subject only to the Assumed Liabilities), would adversely impact the Trustee's efforts to maximize the value of the Debtors estates.

### Prompt Consummation

Q.     Based on the record of the Preliminary Sale Hearing, and the final Sale Hearing, and for the reasons stated on the record at the Preliminary Sale Hearing and final Sale Hearing, the sale of the Acquired Assets must be approved and consummated promptly to preserve the value of the Acquired Assets.  Time, therefore, is of the essence in effectuating the APA.  As such, the Trustee and the Purchaser intend to close the sale of the Acquired Assets as soon as reasonably practicable.  The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the APA.  Accordingly, there is sufficient cause to waive the stay provided in the Bankruptcy Rules 6004(h).

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

### General Provisions

1.     The Sale Motion is GRANTED to the extent set forth herein.

2.      All objections to or reservation of rights with respect to the Sale Motion or the relief requested therein that have not been withdrawn or resolved are overruled with prejudice.  All persons and entities who did not object or withdraw their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      The APA, and all terms and conditions thereof, are hereby approved in all respects. The failure to specifically include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision.

**Transfer of the Acquired Assets as set forth in the Asset Purchase Agreement**

4.      The Trustee is authorized and directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Sale in accordance with the terms and conditions set forth in the APA and this Sale Order, and (b) take all further actions and execute and deliver any and all additional instruments and documents that may be necessary or appropriate to implement the APA and consummate the Sale in accordance with the terms thereof, all without further order of the Court.

5.      The Purchaser is not acquiring any of the Excluded Assets or assuming any of the Excluded Liabilities.

6.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Trustee to transfer the Acquired Assets to the Purchaser (or its designee) in accordance with the APA and this Sale Order.

7.      At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Acquired Assets shall be immediately vested in the Purchaser (or its designee) pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code.  Such transfer shall constitute a legal,

valid, enforceable, and effective transfer of the Acquired Assets.  All persons or entities, presently or at or after the Closing, in possession of some or all of the Acquired Assets, are directed to surrender possession of any and all portions of the Acquired Assets to the Purchaser (or its designee) or its respective designees on the Closing or at such time thereafter as the Purchaser (or its designee) may request.

8.     This Sale Order (a) shall be effective as a determination that, as of the Closing, (i) no claims other than the Assumed Liabilities will be assertable against any Purchaser Party or any of its respective assets, (ii) the Acquired Assets shall have been transferred to the Purchaser (or its designee) free and clear of all liens, claims, encumbrances and interests subject only to the Assumed Liabilities, and (iii) the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.  In particular, the Acquired Assets are sold free and clear of any rights, claims encumbrances or interest that relate to or arise or in connection with under the License Agreement, which was properly terminated by the Trustee.  All liens, claims, encumbrances and interests, on the Acquired Assets shall attach to the proceeds of the Sale ultimately attributable to the property against which such liens, claims, encumbrances and interests, applied or other specifically dedicated funds, in the same order of priority and with the

same validity, force, and effect that such liens, claims, encumbrances and interests, applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

9. Except as otherwise provided in the APA, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtors estate, the Acquired Assets, and the ownership, sale, or operation of the Acquired Assets prior to Closing or the transfer of the Acquired Assets to the Purchaser (or its designee), are hereby forever barred, estopped, and permanently enjoined from asserting such claims against any Purchaser Party and its property (including, without limitation, the Acquired Assets). Following the Closing, no holder of any claim or interest shall interfere with the Purchaser's (or its designee's) title to or use and enjoyment of the Acquired Assets based on or related to any such claim or interest, or based on any action the Trustee may take in the Debtors Chapter 7 cases.

10. If any person or entity that has filed financing statements, mortgages, mechanic's claims, lis pendens, or other documents or agreements evidencing claims against the Debtors estate or in the Acquired Assets shall not have delivered to the Trustee prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all liens, claims, encumbrances and interests, that the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then only with regard to the Acquired Assets that are purchased by the Purchaser (or its designee) pursuant to the APA and this Sale Order, (a) the Trustee is hereby authorized and directed to execute and

file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Acquired Assets, (b) the Purchaser (or its designee) is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims, encumbrances and interests, against the Purchaser Parties and the Acquired Assets, and (c) upon consummation of the Sale, the Purchaser (or its designee) may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all liens, claims, encumbrances and interests, that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Acquired Assets.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.  Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and assignment of the Acquired Assets free and clear of liens, claims, encumbrances and interests, shall be self-executing and neither the Trustee nor the Purchaser (or its designee) shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

## No Successor or Transferee Liability

11.    No Purchaser Party shall be deemed, as a result of any action taken in connection with the APA, the consummation of the Sale contemplated by the APA, or the transfer, operation, or use of the Acquired Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors

including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, the Employee Retirement Income Security Act of 1974 ("ERISA"), tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation.

12.    Immediately prior to the Closing, the Purchaser was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or controlling stockholders existed between the Purchaser, the Trustee and the Debtors.

13.    Other than as expressly set forth in the APA, no Purchaser Party shall have any responsibility for (a) any liability or other obligation of the Debtors or related to the Acquired Assets or (b) any claims against the Debtors or any of their predecessors or affiliates.  Except as expressly provided in the APA with respect to the Purchaser, no Purchaser Party shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as defined herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, liabilities on account of (a) any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the

Acquired Assets or the Assumed Liabilities prior to the Closing or in respect of pre-Closing periods or (b) any plan, agreement, practice, policy, or program, whether written or unwritten, providing for pension, retirement, health, welfare, compensation or other employee benefits which is or has been sponsored, maintained or contributed to by any Debtor or with respect to which any Debtor has any liability, whether or not contingent, including, without limitation, any "multiemployer plan" (as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of ERISA) to which any Debtor has at any time contributed, or had any obligation to contribute.  No Purchaser Party shall have any liability or obligation under any applicable law, including, without limitation, (a) the WARN Act (29 U.S.C. §§ 2101 et seq.), (b) the Comprehensive Environmental Response Compensation and Liability Act, (c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (the "NLRA"), or (f) any foreign, federal, state, or local labor, employment or environmental law, by virtue of the Purchaser's purchase of the Acquired Assets, or assumption of the Assumed Liabilities.

14.    Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against any Purchaser Party or their respective assets (including, without limitation, the Acquired Assets), with respect to any (a) claim in these Chapter 7 cases or in connection with or related to the Sale or the Debtors or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b):  (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest,

or encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Acquired Assets or conduct any of the businesses operated with respect to such assets.

## Good Faith of Purchaser

15.     The Sale contemplated by the Purchase Agreement is undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

16.     Neither the Trustee nor the Purchaser have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Acquired Assets under the APA is fair and reasonable, and the Sale may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

## Other Provisions

17.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court, (a) to allow the Purchaser to give the Trustee any notice provided for in the APA, (b) to allow the Purchaser to take any and all actions permitted by the APA in accordance with the terms and conditions thereof,

including, without limitation, effectuating the Sale and the other transactions contemplated by the APA and (c) to otherwise implement the terms and provisions of the APA and this Sale Order.

18.    The terms and provisions of the APA, and this Sale Order shall be binding in all respects upon the Trustee, the Debtors, their affiliates, their estates, all creditors of (whether known or unknown) and holders of equity interests in any Debtor, any holders of claims against or on all or any portion of the Acquired Assets, the Purchaser Parties, and all of their respective successors and assigns including, but not limited to, the Trustee and any subsequent trustee(s), examiner(s), or receiver(s) appointed in any of the Debtors' Chapter 7 cases under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding. The APA shall not be subject to rejection or avoidance by the Trustee, the Debtors creditors, their shareholders, or any subsequent trustee(s), examiner(s), or receiver(s).

19.    Each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

20.    The APA and the Sale contemplated hereunder shall not be subject to any bulk sales laws or any similar law of any state or jurisdiction.

21.    All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

22.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, and 9014 or otherwise, the terms and conditions of this Sale Order shall be effective immediately upon entry and the Trustee and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Order.

16

23.     To the extent there is any conflict between the terms of this Sale Order and the

APA, the terms of this Sale Order shall control.

24.     The Court shall retain exclusive jurisdiction with respect to the terms and

provisions of this Sale Order and the APA.


Dated:_____          _____

                                         Honorable Elizabeth D. Katz
                                         Chief United States Bankruptcy Judge

**<u>Exhibit D</u>**

Termination Notice

# WEINER LAW FIRM, P.C.

### ATTORNEYS AT LAW

GARY M. WEINER

1441 MAIN STREET, SUITE 610
SPRINGFIELD, MASSACHUSETTS 01103
TEL: (413) 732-6840
FAX: (413) 785-5666
Website: www.WeinerLegal.com

MARK H. BLUVER♦

ROBERT E. GIRVAN, III

♦Of Counsel

Writer's email: GWeiner@Weinerlegal.com

September 15, 2023

Robb J. Osinski,
Executive Chairman
INQUE Holdings LLC
182 Atlantic Avenue, Apt. A
Salisbury, MA 01952-277
(508) 328-4800
Attention: Robb J. Osinski
E-mail: robb@INQUEme.com

*VIA CERTIFIED MAIL*

## RE: NOTICE OF TERMINATION OF EXCLUSIVE LICENSE AGREEMENT
Bambu Global, LLC, Chapter 7, Case No. 22-40323-EDK
Bambu Vault, LLC,   Chapter 7, Case No. 22-40324- EDK

Dear Mr. Osinski:

As you know, I am the duly appointed Chapter 7 trustee in bankruptcy for Bambu Global LLC and Bambu Vault LLC f/k/a Performance Indicator ("BV"). As of the petition date in these Chapter 7 cases (i.e. April 29 2022)(the "Petition Date"), BV was a party to an Exclusive License Agreement (the "Agreement") dated February 15, 2019, whereby it licensed certain of its intellectual property to INQUE Holdings LLC ("INQUE") in the field of skin tissue marking ink. Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.

In recent weeks, I have become aware that INQUE is in default of and has materially breached its obligations under the Agreement. Among other defaults, INQUE has repeatedly failed to deliver certified Quarterly Reports and it has repeatedly failed to pay Sublicense Fees due and owing to BV, including with respect to its Sublicense Agreement with MT.DERM GmbH (the "MT DERM Sublicense").

Specifically, under Section 13.3 of the Agreement, INQUE is required to provide BV with a Quarterly Report, in a form acceptable to BV, within 30 business days of the end of each calendar quarter. These reports must be made regardless of whether any Licensed Products were sold during such quarter. In addition, pursuant to Section E of Schedule A to the Agreement, INQUE is obligated to pay BV all Sublicense Fees within 30 days after INQUE receives payments from any sublicensee. To the extent that payment by INQUE would be required sooner than 30 days, pursuant

to Section 3.2 of the Agreement, INQUE may pay applicable Sublicense Fees within 20 days after the end of each calendar quarter. Since the Petition Date, INQUE has not furnished BV with any Quarterly Reports, nor has INQUE paid any Sublicense Fees despite its receipt of sublicense revenues under the MT Derm Sublicense.

Pursuant to Section 5.3 of the Agreement, all amounts due and payable under the Agreement that are not paid within 30 days of the invoice date shall accrue interest at the lower of (i) one and one-half percent (1.5%) percent per month and (ii) the maximum rate allowed by applicable law, which interest shall be calculated and compounded daily on the unpaid balance on the basis of a 365-day year. In addition, INQUE is responsible for all costs and fees of collection, including, without limitation, attorneys' fees.

Each of the foregoing defaults constitutes a material failure by INQUE to comply with specific terms of the Agreement. Each of these failures also constitutes cause for termination of the Agreement under Section(s) 10.1.1(i) and/or 10.1.1(ii). In light of the foregoing, and in my capacity as trustee in bankruptcy for BV, this letter shall serve as notice that I am hereby exercising my right to terminate the Agreement. Pursuant to Section 10.2 of the Agreement, such termination shall be effective within 60 days of the date hereof, unless INQUE cures each of its defaults to my reasonable satisfaction.

Separately, I am filing a motion with the Bankruptcy Court seeking authority to conduct an examination of INQUE under Rule 2004 of the Federal Rules of Bankruptcy Procedure. This 2004 examination will include a royalty audit and technical audit as authorized by Section 13.4 of the Agreement. My accountants at Verdolino & Lowey will conduct the royalty audit. In this regard, please furnish me immediately with a fully executed copy of the MT Derm Sublicense and any other license that INQUE has entered into with respect to the intellectual property covered by the Agreement.

This notice is without prejudice to any of BV's rights (including, without limitation, to receive full payment of all Sublicense Fees owed by INQUE under the Agreement), powers, privileges, remedies, and defenses, now existing or hereafter arising under the Agreement or otherwise, all of which are hereby expressly reserved.

Very truly yours,

Bambu Vault, LLC

Gary Weiner, Esq.
Chapter 7 Trustee

cc: Michael Fencer, Esq. (via email only)
    Craig Jalbert, (via email only)
    Robert E. Girvan, III, Esq.